Filed 11/8/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ANTHONY Q., a Person Coming Under the Juvenile Court Law. | B267352 |
| | (Los Angeles County Super. Ct. No. CK65790) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JONATHAN Q., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Minor.

Jonathan Q., the presumed father of 10-year-old Anthony Q., appeals the juvenile court's disposition order of July 29, 2015 pursuant to Welfare and Institutions Code section 361, subdivision (c),[1] removing Anthony from his physical custody following the court's finding there would be a substantial danger to the physical health, safety, protection or physical or emotional well-being of the child if he were returned to Jonathan's home.  Relying on the express language of section 361, subdivision (c), which refers to taking a child from the physical custody of a parent or guardian "with whom the child resides at the time the petition was initiated," and the analysis of our colleagues in Division Three of this court in *In re Dakota J.* (2015) 242 Cal.App.4th 619 (*Dakota J.*), Jonathan contends the juvenile court lacked authority to make a removal order because Anthony was residing with his maternal stepgrandmother, not with Jonathan, at the time the section 300 petition was filed in this case.  The Los Angeles County Department of Children and Family Services (Department), which recommended the juvenile court remove Anthony from Jonathan's custody, has submitted a letter to this court conceding Jonathan's challenge to the disposition order is warranted.

We agree the juvenile court cited the incorrect statutory provision in ordering Anthony removed from Jonathan's physical custody, but disagree section 361, subdivision (c), provides the sole statutory authority for the removal of a child from the physical custody of a parent who has been found to pose a substantial danger if allowed to live in the same home as his or her child or otherwise to exercise that parent's right to legal and physical custody.  Under the circumstances of this case, the juvenile court's error in relying on section 361, subdivision (c), rather than the broader grant of authority in sections 361, subdivision (a), and 362, subdivision (a), was harmless.  Accordingly, we affirm the disposition order.

---

[1] Statutory references are to this code unless otherwise stated.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Events Preceding the December 5, 2014 Dependency Petition*

This is Anthony's third dependency proceeding. In late 2006 the Department filed a petition alleging that Jonathan and Anthony's mother, Christina R., had a history of domestic violence, including multiple incidents in October and November 2006, and that both Jonathan and Christina were unwilling or unable to supervise or care for Anthony due to their mental and emotional limitations. Then nine-month-old Anthony was ordered suitably placed in January 2007 but was returned to Jonathan with a home-of-parent order in May 2008. On November 18, 2008 the juvenile court terminated its jurisdiction with a family law order granting sole legal and physical custody to Jonathan.

In October 2010 the Department filed a second section 300 petition, and the court exercised dependency jurisdiction based on Jonathan's severe mental health issues ("a diagnosis of bi-polar and borderline personality disorder, suicidal and homicidal ideation, and self mutilation behavior") and his failure to participate in mental health services, as well as Christina's failure to provide the child with the necessities of life. Anthony, then six years old, was removed from Jonathan, who received family reunification services through April 2012 when Anthony was again returned to Jonathan by a home-of-parent order. As of the time of this petition Christina had not seen Anthony for more than two years. The case was terminated in January 2013.

On December 5, 2014 the Department filed its third section 300 petition to protect Anthony. This proceeding was prompted by a June 2014 referral alleging emotional abuse of Anthony by Jonathan. The Department's investigation revealed Jonathan and Anthony had been living with the paternal great-grandmother until Jonathan remarried. Jonathan then brought Anthony to live with him and his new wife, Daniela, in Palmdale. A criminal background check disclosed a series of misdemeanor arrests and convictions since the termination of the prior dependency proceeding.

At a team decision meeting in July 2014 Jonathan, who continued to have mental health issues and who admitted to using methamphetamine, but only "recreationally,"

3

stated he was willing to take the psychotropic medication that had been prescribed for him, something he would do only sporadically in the past, and to follow through with mental health services. He told the social workers he wanted Anthony to remain with him. By the following month, however, Daniela informed the Department she and Jonathan had decided to "go separate ways." Anthony was by then living in the home of Daniela's mother (Anthony's stepgrandmother), Francisca, where Daniela's three children were also living. Jonathan did not live in the home and saw Anthony only once or twice a week. On December 1, 2014 Francisca told the social worker she believed Jonathan was using drugs and reported he had been acting "crazy." She said Jonathan had damaged some of her property and, as a result, she no longer allowed Jonathan in her home. Paternal relatives reported Jonathan was homeless.

Although Jonathan knew the Department was concerned and considering opening a new case for Anthony, he stopped communicating with the social workers in August 2014 and had provided no information as to how he could be contacted. As reflected in its detention report dated December 5, 2014, the Department concluded it was necessary to detain Anthony due to the substantiated allegation of general neglect by Jonathan, Jonathan's failure to inform the Department of his plan to leave Anthony with his stepgrandmother and Jonathan's recent erratic behavior. The Department noted that Anthony appeared to be have been well cared for by his stepgrandmother. Francisca said she would like to continue to take care of Anthony, and Anthony confirmed he would like to remain living with her.

2. *The December 5, 2014 Dependency Petition, Detention and the Jurisdiction Hearing*

The Department filed a petition pursuant to section 300, subdivision (b) (failure to protect), on December 5, 2014. Count b-1 alleged, "The child Anthony Q[.]'s father, Jonathan Q[.,] has an unresolved history of mental and emotional issues including a diagnosis of Bi-Polar Disorder and self-mutilation, which if left untreated, renders the father incapable of providing the child with regular care and supervision. The father has failed to take the father's prescribed psychotropic medication in a consistent manner. On

4

prior occasions, the father was involuntarily hospitalized for evaluation and treatment of the father's mental health issues. The father's unresolved mental and emotional issues place the child at substantial risk of harm." Count b-2 alleged, "The child, Anthony Q[.]'s father, Jonathan Q[.] has a history of substance use. Father last used drugs in May of 2014. Father's recent drug use places the child at substantial risk of harm." The petition indicated Anthony had resided with Jonathan prior to intervention and had been detained in the home of a relative, Francisca. Both Jonathan and Christina were listed as "Whereabouts Unknown."

At the hearing on December 5, 2014 the court found a prima facie case for detaining Anthony had been established. The court further found, pursuant to section 319, that substantial danger existed to Anthony's physical or emotion health and no reasonable means existed to protect him without removal from Jonathan's home. Anthony was ordered detained in shelter care.

The jurisdiction/disposition report filed January 8, 2015 disclosed that Jonathan was in custody at the Twin Towers Correctional Facility (he apparently had been arrested on December 20, 2014). In an interview on January 27, 2015 Jonathan expressed his preference for Anthony to be placed in the home of the paternal great-grandmother or with a paternal aunt, Faviola B., rather than with the maternal stepgrandmother.[2] Jonathan expressed a desire to reunify with Anthony if he were to be released from custody soon. In a last-minute-information report for the court filed February 26, 2015, the Department explained Jonathan's family had decided that paternal aunt Blanca D., rather than the paternal great-grandmother or paternal aunt Faviola, was the most appropriate relative for placement of Anthony.

---

[2]    Jonathan explained his preference for placement with paternal relatives was because he anticipated he and Daniela would divorce in the future. "It's not about my mother-in-law; she does a great job. I just don't want to deal with the red tape of my mother-in-law in the future."

On March 12, 2015 the Department reported to the court that Anthony had been removed from Francisca's home on February 27, 2015 and placed in foster care after Francisca stated she and her husband no longer wished to continue to care for Anthony.[3] The Department also reported that Anthony had met with Blanca and wanted to be placed with her.

On March 12, 2015, appearing in custody and represented by counsel, Jonathan waived his rights to a trial and pleaded no contest to the December 5, 2014 petition. The allegation in count b-1 that Jonathan was incapable of providing Anthony with "regular care and supervision" was modified to read "adequate care and supervision"; and, as modified, the court sustained both counts. Anthony remained detained in shelter care, and the Department was granted discretion to release him to any appropriate relative. The court scheduled the disposition hearing for April 14, 2015.

On March 23, 2015 the court ordered Anthony placed with Blanca, who had advised the Department the prior week she was willing to provide Anthony with a permanent home if need be. The court also designated Blanca as the educational rights holder for Anthony.

3. *The Disposition Hearing*

On April 14, 2015, the date initially scheduled for the disposition hearing, Christina made her initial appearance in the proceedings. In a last-minute-information report for the court the Department stated Christina had not seen Anthony for five or six years. When told Anthony did not want to have contact with her, Christina stated, "If he doesn't want to, I'm going to respect that . . . . I want to make this as painless as possible."

The disposition hearing was continued to May 7, 2014 to permit the Department to prepare a supplemental report concerning Christina and then continued again when

_____

[3] This change of heart appears to be related, at least temporally, to notice that a criminal waiver would be required for Francisca's husband if Anthony were to continue to live in the home.

6

Jonathan and Christina asked it be set for a contest. The hearing was thereafter continued several more times, once because Jonathan was again in custody and then because Christina was ill, and finally went forward on July 29, 2015 with neither parent present.

The only two issues argued at the hearing were whether Christina should receive family reunification services—she requested them; the Department opposed—and whether Jonathan's family reunification services should include participation in a full substance abuse treatment program, as the Department urged, or only drug testing, as Jonathan requested, with participation in a drug program required only if he tested positive or missed a test.

Based on the reports admitted into evidence and argument of counsel, the court declared Anthony a dependent child of the court and found by clear and convincing evidence, pursuant to section 361, subdivision (c), there was a substantial danger if Anthony were returned to Jonathan's home and no reasonable means by which the child's physical health could be protected without removing him from the parents' physical custody. Accordingly, the court ordered Anthony removed from the custody of his parents[4] and ordered care, custody, control and conduct of the child placed under the supervision of the Department. The court ordered family reunification services for Jonathan, including participation in a full drug and alcohol program with random and on-demand testing, and, over the objection of the Department, for Christina. Both parents' visits were to be monitored (Christina's in a therapeutic setting) with discretion in the Department to liberalize visitation. Anthony remained suitably placed with his paternal aunt Blanca.

---

[4] The reporter's transcript of the July 29, 2015 hearing used the plural "parents" in recording the removal order; the clerk's transcript the singular "parent." Because Christina is not a party to this appeal, we need not attempt to reconcile that discrepancy. (See generally *In re Merrick V.* (2004) 122 Cal.App.4th 235, 249 ["[c]onflicts between the reporter's and clerk's transcripts are generally presumed to be clerical in nature and are resolved in favor of the reporter's transcript unless the particular circumstances dictate otherwise"].)

**CONTENTION**

Jonathan had sole legal and physical custody of Anthony prior to the initiation of these dependency proceedings. On appeal Jonathan contends only that the juvenile court lacked authority to remove Anthony from his physical custody because Anthony was not residing with him at the time the section 300 petition was filed. He does not challenge the finding adjudging Anthony a dependent child of the court under section 300, subdivision (b), on the ground there was a substantial risk Anthony would suffer serious physical harm as a result of Jonathan's inability to supervise or protect him. Nor does he question the sufficiency of the evidence for the court's additional findings, by clear and convincing evidence, there would be a substantial danger to the physical health or physical or emotional well-being of Anthony if he were returned to Jonathan's home and no reasonable means existed to protect Anthony without removing him from Jonathan's physical custody.

**DISCUSSION**

1. *Standard of Review*

We normally review an order removing a child from parental custody for substantial evidence viewing the record in the light most favorable to the juvenile court's findings. (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1116; *In re D.G.* (2012) 208 Cal.App.4th 1562, 1574.) When the issue on appeal involves the interpretation and proper application of the dependency statutes, however, our review is de novo. (*Dakota J.*, *supra*, 242 Cal.App.4th at p. 627; *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613; see *In re Christian P.* (2012) 208 Cal.App.4th 437, 446; see generally *John v. Superior Court* (2016) 63 Cal.4th 91, 95.)

The principles governing our construction of these statutes are both well-established and familiar: "'Our primary task in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent. [Citation.]' [Citation.] We construe the statute's words in context, and harmonize statutory

provisions to avoid absurd results. [Citation.] If we find the statutory language ambiguous or subject to more than one interpretation, we may look to extrinsic aids, including legislative history or purpose to inform our views." (*John v. Superior Court*, *supra*, 63 Cal.4th at pp. 95-96; accord, *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037; see *In re D.B.* (2014) 58 Cal.4th 941, 945-946 ["we 'will not give statutory language a literal meaning if doing so would result in absurd consequences that the Legislature could not have intended'"].)

2. *Forfeiture*

In his respondent's brief in support of the juvenile court's removal order,[5] Anthony argues we should not consider Jonathan's appeal because he did not object in the juvenile court that removal of Anthony from his physical custody was not authorized by section 361, subdivision (c). Although the forfeiture doctrine applies in dependency cases and the failure to object to a disposition order on a specific ground generally forfeits a parent's right to pursue that issue on appeal (*In re T.G.* (2015) 242 Cal.App.4th 976, 984; see *In re S.B.* (2004) 32 Cal.4th 1287, 1293), when the appeal involves an important and purely legal issue subject to our independent review, as it does here, we have discretion to entertain the challenge to the juvenile court's order notwithstanding the parent's failure to object on that basis in the juvenile court. (*In re S.B.*, at pp. 1294-1295 [Court of Appeal did not abuse its discretion in considering the mother's challenge to a visitation order that presented an important question of law]; *In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1252; *In re V.F.* (2007) 157 Cal.App.4th 962, 967-968.) In view of the significance to the dependency system of the issue presented, we exercise our discretion to address the merits of Jonathan's appeal.

---

[5] As discussed, the Department has stated in a letter to this court that it believes Jonathan's challenge to the disposition order is warranted even though it had recommended the juvenile court remove Anthony from Jonathan's physical custody. Anthony has filed the only respondent's brief in the matter.

3. *The Juvenile Court's Power To Restrict Parental Control of a Child Adjudged a Dependent of the Court and the Section 361, Subdivision (c), Limitation on that Authority*

   a. *Statutes authorizing the judicial court to limit parental control of a dependent child*

At the jurisdiction hearing the juvenile court determines whether one or more of the statutory conditions identified in section 300 has been established and, therefore, whether to exercise dependency jurisdiction. (§§ 355, subd. (a), 356; Cal. Rules of Court, rule 5.684(f);[6] see *In re Ethan C.* (2012) 54 Cal.4th 610, 624-625.) After the juvenile court has assumed jurisdiction, the court is required to hear evidence on the question of the proper disposition to be made of the child. (§ 358, subd. (a); rules 5.684(g), 5.690; see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) In most cases at the disposition hearing, once the child has been ordered and adjudged to be a dependent child of the court pursuant to section 360, subdivision (d), the court determines what services the child and the family need to be reunited and free of court supervision. (See §§ 361, 361.2, 362; rule 5.695; see also *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 302.)

In making its disposition orders the court has broad discretion to resolve issues regarding the custody and control of the child, including deciding where the child will live while under the court's supervision. (See *In re Maya L.* (2014) 232 Cal.App.4th 81, 97 ["[o]nce the juvenile court has assumed jurisdiction, the court must hold a disposition hearing to determine, among other things, an appropriate placement for the child"].) Section 361, subdivision (a), provides, "In all cases in which a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may limit the control to be exercised over the dependent child by any parent or guardian and shall by its order clearly and specifically set forth all those limitations." Section 362, subdivision (a), amplifies that provision, stating, "If a child is

---

[6] References to rule or rules are to the California Rules of Court.

10

adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court." (See also § 245.5 ["In addition to all other powers granted by law, the juvenile court may direct all such orders to the parent, parents, or guardian of a minor who is subject to any proceedings under this chapter as the court deems necessary and proper for the best interests of or for the rehabilitation of the minor. These orders may concern the care, supervision, custody, conduct, maintenance, and support of the minor, including education and medical treatment."]; § 362, subd. (d) ["[t]he juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . ."].)

Notwithstanding the expansive language in these grants of judicial authority, the statutes and case law mandate the juvenile court may impose only those limits on parental rights that are necessary to protect the child. (E.g., §§ 361, subd. (a) ["[t]he limitations may not exceed those necessary to protect the child"]; 362, subd. (a) [orders for the care, supervision and custody of the child must be "reasonable"].) As the Supreme Court explained in *In re Ethan C.*, *supra*, 54 Cal.4th at page 625, "Even after a dependency finding has been made, the statutory scheme is designed to allow retention of parental rights to the greatest degree consistent with the child's safety and welfare, and to return full custody and control to the parents or guardians if, and as soon as, the circumstances warrant." (See § 300.2 [the focus of the dependency laws "shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child"].)

> b. *Section 361, subdivision (c)'s limitation on the court's ability to restrict parental control*
>
> i. *The statutory language*

One limit on the court's authority to restrict a parent's rights following the exercise of dependency jurisdiction is set forth in section 361, subdivision (c): "A

11

dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated unless the juvenile court finds clear and convincing evidence of [certain specified detrimental conditions, including] [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . ."

Two related aspects of section 361, subdivision (c), are of fundamental significance when analyzing the issue presented by Jonathan's appeal. First, section 361, subdivision (c), is not the source of the court's authority to remove a child from a parent's custody. As discussed, limitations on a parent's control of a dependent child are authorized by sections 361, subdivision (a), and 362, subdivision (a); subdivision (c) imposes a restriction or exception to that general authority. Second, the rigorous requirements of section 361, subdivision (c), apply only when the issue is whether to remove a dependent child from the physical custody of a parent with whom the child was residing at the time the dependency petition was initiated. That provision does not address the court's authority when considering the appropriate restrictions on the rights of an offending nonresident custodial parent, that is a parent who has some right to physical custody of a child (whether sole or joint) but was not residing with him or her at the relevant time.

ii. *Legislative history of sections 361 and 362*

These two elements of section 361, subdivision (c), apparent from the plain meaning of the provision's language, are confirmed by a review of the historical development of the section. (See *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1046 [courts may properly "look to legislative history to confirm our plain-meaning construction of statutory language"]; *Kulshrestha v. First Union Commercial Corp*. (2004) 33 Cal.4th 601, 613, fn. 7 ["courts may always test their construction of disputed statutory language

against extrinsic aids bearing the drafters' intent"]; see also *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1335 [although the meaning of words in a statute "is plain, it is helpful to look at [the statute's] legislative history"].)

When section 361 was originally enacted in 1976, the precursor to current subdivisions (a) and (c) was a single compound sentence: "In all cases wherein a minor is adjudged a dependent child of the court, the court may limit the control to be exercised over such dependent child by any parent or guardian and shall by its order clearly and specifically set forth all such limitations, but no dependent child shall be taken from the physical custody of a parent or guardian unless upon the hearing the court finds one of the following facts . . . ." (Stats. 1976, ch. 1068, § 10, p. 4773.) The structure of this provision makes clear that the first independent clause empowered the juvenile court to make certain orders to protect a dependent child while the second independent clause functioned as a limitation on that authority.

The same legislation also added section 362 to the Welfare and Institutions Code, which provided, "When a minor is adjudged a dependent child of the court on the ground that he is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of such minor, including medical treatment, subject to further order of the court. [¶] The court may order the care, custody, control and conduct of such minor to be under the supervision of the probation officer or may commit such minor to the care, custody and control of: [¶] (a) Some reputable person of good moral character who consents to such commitment. [¶] . . . [¶] (c) The probation officer, to be boarded out or placed in some suitable family home or suitable private institution . . . ." (Stats. 1976, ch. 1068, § 10, p. 4773.) By its express terms this provision granted the juvenile court the authority, in addition to and independent of the orders permitted by section 361, to suitably place a dependent child outside the home of his or her parents.

In 1982, among other revisions to section 361, the Legislature divided that section's initial compound sentence into two subdivisions (former subdivisions (a) and

13

(b)), required the findings necessary to remove the child from the physical custody of his or her parents or guardians to be based on clear and convincing evidence and expanded the list of circumstances that justified the order taking the child from a parent's or guardian's custody: "(a) In all cases wherein a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may limit the control to be exercised over such dependent child by any parent or guardian and shall by its order clearly and specifically set forth all such limitations. The limitations shall not exceed those necessary to protect the child. [¶] (b) No dependent child shall be taken from the physical custody of his or her parents or guardians unless, upon the hearing, the juvenile court finds clear and convincing evidence of any of the following: . . . ." (Stats. 1982, ch. 978, § 20, p. 3535.)

In 1986, as part of a reorganization and revision of California's dependency law, the scope of former subdivision (b) (now subdivision (c)[7]) of section 361 was expressly limited by adding the phrase "with whom the child resides at the time the petition was initiated." As amended, former subdivision (b) read, with several additional nonsubstantive changes, "No dependent child shall be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated unless the juvenile court finds clear and convincing evidence of any of the following [circumstances]: . . . ." (Stats. 1986, ch. 1122, § 11, p. 3981.)

The same legislation (Sen. Bill No. 1195 (1985-1986 Reg. Sess.)) also substantially revised the language of section 362, which, after amendment, provided in subdivision (a), "When a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may make any and all

---

[7]     In 1997 a new subdivision (b) was added to section 361, affirming the ability of a parent to voluntarily relinquish his or her child to the State Department of Social Services or a licensed county adoption agency even though the child is a dependent child of the juvenile court and the parent's control of the child has otherwise been limited. (Stats. 1997, ch. 793, § 15, p. 5325.) As a result, former subdivision (b) became subdivision (c)—its current designation. (*Ibid*.)

14

reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor, including medical treatment, subject to further order of the court." (Stats. 1986, ch. 1122, § 14, p. 3986.)[8]

Although there have been additional amendments to the language of sections 361, subdivisions (a) and (c), and 362, subdivision (a), since 1986 (see, e.g., Stats. 2002, ch. 180, § 2, p. 830 [replacing the initial wording in § 361, subd. (c), "No dependent shall be taken," with "A dependent child may not be taken"]); Stats. 1998, ch. 1054, § 26, p. 8124 [substituting "child" for "minor" in § 362, subd. (a)]), the structure and relationship of these provisions—the broad grant of authority in sections 361, subdivision (a), and section 362, subdivision (a), and the narrowly focused limitation on that authority in section 361, subdivision (c)—have not changed in the last 30 years.

In short, as demonstrated by its express language and legislative history, section 361, subdivision (c), restricts the juvenile court's authority at disposition only when the court is considering removing a dependent child from the physical custody of the parent with whom the child actually resides. In all other circumstances, pursuant to sections 361, subdivision (a), and 362, subdivision (a), orders limiting the control of the parents of a dependent child and providing for the care, custody, supervision, conduct and support of that child, including removing the child from the custody of a nonresident custodial parent and determining where that child shall live while under the jurisdiction of the court, are proper so long as the evidentiary record supports the court's findings that the orders are reasonable and necessary for the protection of the child. (*In re Julien H.* (2016) 3 Cal.App.5th 1084, 1090.)

---

[8]     Senate Bill No. 1195 (1985-1986 Reg. Sess.) also added section 361.5 to the Welfare and Institutions Code, providing, in part, "whenever a minor is removed from a parent's or guardian's custody, the juvenile court shall order the probation officer to provide child welfare services to the minor and the minor's parents or guardians for the purpose of facilitating reunification of the family . . . ."  (Stats. 1986, ch. 1122, § 13, p. 3984.)

We recognize the Supreme Court in *In re Ethan C.*, *supra*, 54 Cal.4th 610, in a section entitled Overview of Dependency Scheme, referred generally to section 361, subdivision (c)'s requirements for the removal of a child from the physical custody of a parent without noting the subdivision applied only when the child had been residing with that parent at the time the dependency petition was initiated. (*Id.* at p. 625.) Similar statements are found in many Court of Appeal decisions, including those from this division. (See, e.g., *In re E.R.* (2016) 244 Cal.App.4th 866, 875; *In re Summer H.* (2006) 139 Cal.App.4th 1315, 1326; but see *In re Andrew S.* (2016) 2 Cal.App.5th 536, 544.) However, the *In re Ethan C.* Court was not actually interpreting or applying section 361, subdivision (c); and we do not believe its summary description of that provision controls this case. (See *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1134.)

### iii. *The role of section 361.2*

The conclusion that issuance of a removal order is not limited to the circumstances identified in section 361, subdivision (c), is also supported by the wording of section 361.2, subdivision (a), which was added to the Welfare and Institutions Code in 1986 in the same legislation (Sen. Bill No. 1195 (1985-1986 Reg. Sess.)) that inserted the "with whom the child resides" language in former subdivision (b) (now subdivision (c)) of section 361. As enacted, section 361.2, subdivision (a), provided, when a court orders removal of a minor "pursuant to Section 361," if a parent with whom the minor was not residing at the time the events or conditions arose that brought the minor within the provisions of Section 300 requests custody of the child, "the court shall place the minor with the parent unless it finds that placement with that parent would be detrimental to the minor." (Stats. 1986, ch. 1122, § 12, p. 3982.)[9] That is, in directing when the juvenile

---

[9] The legislative history of Senate Bill No. 1195 (1985-1986 Reg. Sess.) does not explain the Legislature's decision to use "at the time the petition was initiated" as the relevant point to define a parent with whom the child *was residing* in section 361, subdivision (c), but "at the time that the events or conditions arose that brought the minor within the provisions of Section 300" as the point to define the parent with whom the child *was not residing* for purposes of section 361.2. We generally presume the

16

court must consider placement of a dependent child with a noncustodial parent, the Legislature referred broadly to the "removal of a child pursuant to Section 361," not simply section 361, subdivision (c). Thus, in the case at bar, because removal of Anthony from Jonathan's custody was authorized under section 361, subdivision (a), the court would have been able to consider not only appropriate reunification services for Jonathan but also placement of Anthony with Christina, in accordance with the strong legislative preference expressed in section 361.2 for keeping a child with a parent, if she had resolved her own emotional and mental health problems and now desired to assume custody of her son. (Cf. *In re Nolan W.* (2009) 45 Cal.4th 1217, 1228 [discussing the dependency scheme's "'strong preference for maintaining the family relationships if at all possible'"].)

4. *The Juvenile Court Erred in Removing Anthony from Jonathan's Physical Custody Pursuant to Section 361, Subdivision (c)*

Focusing on the narrowly drawn language of section 361, subdivision (c), the court in *Dakota J.*, *supra,* 242 Cal.App.4th 619, reversed the juvenile court's disposition order removing two children from their mother's physical custody and ordering them suitably placed. (*Id*. at pp. 629-630.) Although the mother had been awarded sole legal and physical custody of her two sons, as well as her daughter, in a prior dependency proceeding, unlike their sister the two boys had been living with a relative (their stepgrandfather), not their mother, for at least five years when the Department filed a section 300 petition alleging the mother was unable to provide regular care and supervision of all three children due to mental health problems and her chronic use of cocaine and marijuana. (*Dakota J.*, at pp. 623, 626.) Noting there were no published

---

Legislature intended a difference in meaning when it used different language in different provisions in the same legislation. (See *Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 507 [where the Legislature uses different language in one part of a statute than it does in other sections concerning a related subject, it must be presumed the Legislature intended a different meaning]; *People v. Morse* (2004) 116 Cal.App.4th 1160, 1165 ["""[w]hen different language is used in the same connection in different parts of a statute it is presumed the [L]egislature intended a different meaning and effect"""].)

cases defining "resides" as used in section 361, subdivision (c), the court ascribed to the term its historical and common meaning, "to dwell permanently or for a considerable time" (*Dakota J.*, at p. 628) and concluded "the statute does not contemplate that a child could be removed from a parent who is not living with the child at the relevant time." (*Id.* at p. 628.)[10]

We concur in the *Dakota J.* court's interpretation of section 361, subdivision (c), and, accordingly, agree with Jonathan's argument and the Department's concession on appeal that removal of Anthony from Jonathan's physical custody pursuant to that provision was error. Without challenging the principal holding of *Dakota J.*, Anthony contests this conclusion, contending the "with whom the child resides" requirement of section 361, subdivision (c), was satisfied in this case because he was living with Jonathan at the time the Department first became involved in the matter in the summer of 2014, even though Jonathan had sent him to live with his stepgrandmother Francisca well before the dependency petition was actually filed in December 2014.

To the extent Anthony's argument simply suggests, for purposes of section 361, subdivision (c), a child may reside with a parent who is not actually present in the home on the day the dependency petition is filed, he is correct. A parent who temporarily moves out of the family home at the direction of a social worker while the Department investigates allegations of domestic violence, for example, should properly be considered to reside with his or her children in that home if a dependency petition is filed a short time later. (Cf. Fam. Code, former § 297, subd. (c), Stats 2003, ch. 421, § 3, p. 3083 ["[d]omestic partners do not cease to have a common residence if one leaves the common residence but intends to return"].) Or if parents shared physical custody of a child who lived part of the year with one of them and part of the year with the other, the juvenile

---

[10]     As a solitary exception to this general statement concerning section 361, subdivision (c), the court noted that subdivision (c)(5) authorizes the juvenile court to order removal of a child in certain situations involving the incarceration or institutionalization of the parent or total abandonment of the child by the parent. (*Dakota J.*, *supra*, 242 Cal.App.4th at p. 628, fn. 6.)

court could find the child resided with both parents within the meaning of *Dakota J.* and remove him or her from the physical custody of both if the conditions for removal under section 361, subdivision (c), were otherwise satisfied as to each parent. (Cf. Fam. Code, §§ 3004 ["'[j]oint physical custody' means that each of the parents shall have significant periods of physical custody"]; former § 297, subd. (c) ["[t]wo people have a common residence even if one or both have additional residences"].) Here, however, the record established that Anthony had been living with Francisca for approximately six months when the petition was filed and, as reported by Francisca, Jonathan saw his son only one or two times per week. Anthony's home at that point was with Francisca, not Jonathan.

Anthony's broader argument—that a dependency petition has been "initiated" when the Department's investigation of a family begins, however much time may then pass before a section 300 petition is filed—is not supported by the statutory language or practical reality. To be sure, reference to the petition being initiated, rather than the dependency proceeding, is somewhat unconventional. (Cf. *John v. Superior Court*, *supra*, 63 Cal.4th at p. 94 [plaintiff "initiated an unlawful detainer action in November 2011" by filing a complaint]; *Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 338 ["plaintiffs initiated a series of suits in federal and state court" by filing class action complaints].) Nonetheless, by referring to the timing of the petition, rather than the start of the county's investigation or "the time that the events or conditions arose that brought the minor within the provisions of Section 300," as it did in section 361.2, the Legislature plainly intended the formal commencement of the dependency action to be the relevant point for determining whether the child at risk was residing with one or both of his or her parents.

5. *The Court's Error Was Harmless*

As this case demonstrates, reference to a "custodial" or a "noncustodial" parent in dependency cases can, at least on occasion, be somewhat misleading. (See *In re Isayah C.* (2004) 118 Cal.App.4th 684, 699.) Although Anthony was living with his stepgrandmother when dependency proceedings were initiated, Jonathan had sole legal

19

and physical custody of the child pursuant to the order in an earlier dependency case until the juvenile court acted to limit his control in this proceeding. Thus, at least in some respects, Jonathan was a "custodial parent," a status the court properly considered in framing its disposition order.

As discussed, section 361, subdivision (c), is not the source of the juvenile court's statutory authority to make orders concerning the care and custody of a dependent child, but a limitation on that power when the child actually resides with the custodial parent. Accordingly, even though Anthony was living with his maternal stepgrandmother, not Jonathan, at the relevant time and the provisions of section 361, subdivision (c), did not apply to this case, the juvenile court had broad authority, pursuant to sections 361, subdivision (a), and 362, subdivision (a), to enter orders reasonably necessary to address the problems that led to these dependency proceedings and to protect Anthony's well-being. (See *In re Corrine W.* (2009) 45 Cal.4th 522, 532 [under section 362, subdivision (a), "'[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion'"]; *In re Carmen M.* (2006) 141 Cal.App.4th 478, 486 [section 362, subdivision (a), and related provisions of juvenile law have been broadly interpreted to authorize a wide variety of remedial orders intended to protect the safety and well-being of dependent children]; see also *In re Nolan W.*, *supra*, 45 Cal.4th at pp. 1228-1229.) Based on the jurisdiction findings regarding Jonathan's history of substance abuse and unresolved mental and emotional issues, the juvenile court found by clear and convincing evidence there was a substantial danger to Anthony if Jonathan was allowed to resume living with him or otherwise exercise his right to legal and physical custody and no reasonable means existed to protect the child without suspending Jonathan's custody

rights[11]—findings that Jonathan did not challenge on appeal.[12] As a result, the order "removing" Anthony from Jonathan's custody—that is, limiting Jonathan's control of the child, including the right to determine his placement—was fully justified; and the citation to the incorrect statute harmless error. (See *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303-304 [when evidence and findings support juvenile court's disposition order, citation to wrong statute as basis for order is harmless error]; see also *In re Julien H.*, *supra*, 3 Cal.App.5th at p. 1090.)

Our colleagues in Division Three came to the opposite conclusion in *Dakota J.*, identifying two grounds for holding the juvenile court's error in issuing a removal order under section 361, subdivision (c), was not harmless. First, a removal order is the first step in a progression that may lead to termination of parental rights. (*Dakota J.*, *supra*, 242 Cal.App.4th at p. 631.) As the court explained, "the issuance of a removal order triggers the provision (or denial) of reunification services [under section 361.5] and starts the clock running on reunification efforts." (*Ibid.*) Second, under the circumstances of the case before it, the removal order was "punitive." (*Id.* at p. 632.) "[M]other

---

[11] Disposition orders displacing the custodial rights of a parent must be based on clear and convincing evidence of the need for the order to protect the child from severe neglect or physical harm. (See *Dakota J.*, *supra*, 242 Cal.App.4th at pp. 630-631; *In re Isayah C.*, *supra*, 118 Cal.App.4th at pp. 696-697; *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1828-1829.)

[12] In his reply brief Jonathan asserts he had made appropriate care and safety provisions for his son prior to the filing of the section 300 petition by placing the child with a relative "and the Department had no basis for intervening with the family." Jonathan is correct that a parent who recognizes his or her inability to care for a child may entrust that child to a reliable alternative caregiver without necessarily triggering a section 300 petition. (See, e.g., *In re Summer H.*, *supra*, 139 Cal.App.4th at pp. 1333-1334; see also *In re M.M.* (2015) 236 Cal.App.4th 955, 964-965.) However, Jonathan did not contend on appeal the juvenile court's jurisdiction and disposition findings that he posed a substantial danger to Anthony were not supported by the evidence. Moreover, prior to the jurisdiction hearing the maternal stepgrandmother with whom Anthony had been living had advised the Department she no longer wished to continue to care for the child. (See note 3, above.)

recognized her situation and made arrangements for her boys to live with a relative who has cared for them and provided them with a stable home. . . . [¶] . . . Although there is overwhelming evidence to support the removal order as to Faith [the daughter who was living with the mother], Dakota and Joseph have been well cared for and felt safe while with [their stepgrandfather] in his home for more than five years. The Department does not argue otherwise." (*Ibid*.) Neither point justifies a finding of prejudice here.

It may well be that the removal order for the two boys in *Dakota J.* was not justified by the facts of the case—an issue the mother had raised but the appellate court declined to consider. (*Dakota J*., *supra*, 242 Cal.App.4th at p. 630.) But that concern addresses the propriety of the juvenile court's decision to remove or release a child from the physical custody of a nonresident custodial parent, not its authority to do so when necessary to protect the dependent child from a substantial risk of physical harm. It certainly does not demonstrate prejudice to the parent if the court refers to the wrong statute when otherwise properly exercising that authority.

Similarly, it is true, as the *Dakota J.* court explained, that with certain specific exceptions identified in section 361.5, subdivisions (a) and (b), removal of a child from his or her parent's or guardian's custody requires the court to order family reunification services under section 361.5 and that there often follows a series of hearings, within a general 18-month timeline, that may lead to termination of parental rights if the parents do not successfully address the problems that created the need for the assertion of dependency jurisdiction. (See *Bridget A. v. Superior Court*, *supra*, 148 Cal.App.4th at p. 302 ["[u]nder the current statutory scheme dependency proceedings in which a child is removed from his or her home typically involve four phases: jurisdiction, disposition, reunification and implementation of a permanent plan if reunification is unsuccessful"].) But reunification services pursuant to section 361.5 must be ordered as a complement to a disposition order displacing or suspending the custodial rights of a nonresident custodial parent like Jonathan under sections 361, subdivision (a), and 362, subdivision (a), just as with the more normative section 361, subdivision (c), removal order. By its express

22

terms section 361.5, subdivision (a), applies "whenever a child is removed from a parent's or guardian's custody"—not only when removal has been ordered pursuant to section 361, subdivision (c).

This interpretation of the juvenile court's authority under sections 361, 361.5 and 362 not only conforms to the express language of those provisions but also provides the court with the practical tools needed in cases in which an offending parent has sole physical custody of a child who was not residing with that parent when the dependency petition was filed—a need vividly illustrated by the case at bar. (See *People v. Leiva* (2013) 56 Cal.4th 498, 506 [when interpreting a statute, courts should reject a construction "'that is contrary to the legislative intent apparent in the statute or that would lead to absurd results' [citation] or 'would result in absurd consequences that the Legislature could not have intended'"]; *In re J.W.* (2002) 29 Cal.4th 200, 210 [same].) Absent a removal order, the juvenile court could not have ensured Anthony remained in a safe, stable placement that was not subject to Jonathan's right (and whim) to have the child moved to a different relative or once again come live with him, ordered the child welfare services necessary to protect Anthony while assisting Jonathan's attempt to overcome his problems and reunite with his son,[13] or put in place the procedural steps necessary to develop a permanent plan for Anthony under section 366.26, including legal guardianship or adoption, if reunification efforts fail.[14]

\* \* \* \*

---

[13] Far from being punitive, "[r]eunification services are typically understood as a benefit provided to parents, because services enable them to demonstrate parental fitness and so regain custody of their dependent children." (*In re Nolan W.*, *supra*, 45 Cal.4th at p. 1228.)

[14] While this appeal was pending, the juvenile court terminated Jonathan's and Christina's reunification services and thereafter, at a selection and implementation hearing (§ 366.26) on October 21, 2016, terminated their parental rights, freed Anthony for adoption and identified a prospective adoptive parent for the child. We granted Anthony's request to take judicial notice of the minute order from the October 21, 2016 hearing reflecting these developments.

In sum, if the juvenile court finds by clear and convincing evidence at the disposition hearing that it would pose a substantial danger to the physical safety or physical or emotional well-being of a dependent child for a currently nonresident custodial parent to live with the child or otherwise exercise that parent's right to legal and physical custody and there are no other reasonable means available to protect the child, the court is authorized under sections 361, subdivision (a), and 362, subdivision (a), to remove the child from the parent's custody. Reunification services pursuant to section 361.5 must be offered to the parent unless one of the exceptions in that section applies. If a second parent who satisfies the conditions in section 361.2 desires to assume custody of the child, the court must decide whether placement of the child with the second parent would be detrimental to the safety, protection, or physical or emotional well-being of the child and proceed in accordance with the provisions of that section.

Although the juvenile court in this case erred in citing section 361, subdivision (c), when entering its disposition orders, those orders were authorized by the dependency statutes and justified by the court's factual findings.

## DISPOSITION

The juvenile court's July 29, 2015 disposition order is affirmed.


PERLUSS, P. J.

We concur:


ZELON, J.


SEGAL, J.

24