Filed 11/18/20  In re K.V. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.V., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E074955 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1900348) |
| v. | OPINION |
| T.F., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Judith C. Clark, Judge.

Affirmed in part and vacated in part.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant

and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and

Prabhath D. Shettigar, Deputy County Counsels, for Plaintiff and Respondent.

1

T.F. (mother) challenges the jurisdictional and dispositional findings and orders that the juvenile court made in a dependency proceeding as to her minor daughter, K.V. We vacate one of the true findings under Welfare and Institutions Code section 300, subdivision (b)(1) (unlabeled statutory references are to this code). We otherwise affirm.

BACKGROUND

K.V. was born to mother and N.V.1 (father) in July 2018. Before she was one year old, in June 2019, K.V. and her two-year old brother, N.V.2 (brother), came to the attention of the Riverside County Department of Social Services (the Department). On June 7, 2019, the Department received an immediate response referral alleging that K.V. had been admitted to the intensive care unit in the hospital with a brain bleed without an explanation for the injury. A forensic pediatrician reported that the bleeding was acute and that K.V. also was suffering from possible retinal hemorrhaging and two respiratory viruses. While awaiting a final radiology report from a full skeletal survey, the pediatrician reported that K.V. had various fractures, which appeared nonaccidental.

A forensic medical exam was conducted, and the examiner concluded that K.V. had been "the victim of multiple episodes of physical abuse." She suffered "traumatic brain injury," as evinced by "bilateral extra-axial hemorrhage and bilateral, severe retinal hemorrhages." Those injuries were "most consistent with abusive head trauma." There also was evidence of multiple fractures to her radius, ulna, femur, and ribs, which were all found to be in various stages of healing. The fractures to her radius and ulna had

2

likely occurred within one week before June 7, 2019. The examiner opined that the fractures were all consistent with physical abuse.

At the time, K.V. lived with father, his wife (stepmother), brother, and stepmother's three children, including a new baby of father's who was born two days before K.V.'s referral. The family lived with stepmother's parents and two children whom they fostered. K.V. started living with father and stepmother in late March 2019. According to father, mother's boyfriend had contacted him and told father that he needed to pick up K.V. from mother, who lived in Los Angeles County. Stepmother reported that when K.V. lived with mother she "had been left with strangers," and that father had found K.V. in mother's boyfriend's apartment in a car seat on the floor. Father then took K.V. and "left without telling anyone." Father did not know the address or the name of the apartment complex from which he had picked up K.V. For the first eight months of her life, K.V. lived with mother.

When father picked up K.V., she had "terrible sores on her diaper area." Father called mother, and she told him that K.V. had an infection called "'thrash.'" Stepmother and father took K.V. to the hospital, where they learned K.V. had "a yeast infection that had become flesh eating." The forensic examiner reported that the findings from the medical record of that hospital visit on March 28, 2019, were that K.V. had "a pink, excoriated rash in diaper region with hypopigmentation." K.V. was diagnosed with "[c]andidiasis and diaper dermatitis" and prescribed a topical cream with a recommendation that she receive a follow-up examination within the next several days.

3

Stepmother showed the social worker photos of K.V.'s "diaper area" taken on March 28, 2019. In addition to the yeast infection, stepmother said that K.V. was "filthy on her feet and body" even though she was neither crawling nor walking yet and K.V. had a fungal infection around her mouth from her face not being cleaned enough.

According to stepmother, father and mother did not get along. Stepmother showed the social worker text messages stepmother had received from mother on unspecified dates. Stepmother also reported that mother's boyfriends "also call or text [father] to instigate him." She did not specify during what timeframe mother's boyfriends had contacted father.

A social worker attempted to contact mother by text on June 11, 12, and 14, 2019, and by phone call and Facebook messenger on June 14, 2019. Mother did not answer the phone or reply to any of the other attempts to reach her.

Stepmother's six-year old daughter told a social worker that on the day of the incident she had dropped K.V. twice onto a carpeted area of the floor. The six year old also reported that stepmother "'whoop[ed]'" K.V. but did not provide any details. During the interview, the six year old started crying and told the social worker that "she already told her grandmother the truth and [her grandmother] told her not to tell." The forensic pediatrician opined that it was "highly unlikely" that a child dropping K.V. onto carpet "would have produced the acute trauma [K.V.] had suffered."

The Department took K.V. into protective custody while she was in the hospital and filed a section 300 juvenile dependency petition with separate allegations against

4

father and mother. At the detention hearing, the juvenile court ordered K.V. detained.[1] Mother was not present at the hearing. Services were ordered for mother and father pending disposition. Both parents were granted twice-weekly supervised visits.

K.V. was determined to be medically fragile because of the nature of her injuries, the possibility that she might experience seizures, and the numerous follow-up appointments that she had for specialized care. She was placed in a foster home deemed appropriate to care for her in a medically fragile state.

Mother contacted the Department on July 1, 2019. Mother reported that in March 2019 father had taken K.V. without mother's permission. When asked why she had not attempted to locate K.V., mother explained that she filed a report about K.V. being taken but was told by an unspecified agency that "they could not do anything, as he was [K.V.'s] father." She further explained that father "continued to move to different states." Mother admitted that K.V. "had a bad rash and thrush" while in mother's care but claimed to have "sought medical care to meet [K.V.'s] needs." Two days after contacting the Department, Mother visited with K.V. for the first time.

The next month the Department interviewed mother about the allegations in the dependency petition. Mother said that she provided K.V. food and clothes and took care of K.V. before father took her. Mother worked as an unlicensed beautician and sold candy to support herself. Mother said that she had been arrested two years ago in Las Vegas, Nevada for solicitation.

---

[1]    A petition was also filed as to brother, but he is not a party to this appeal.

In September 2017, K.V.'s caretaker reported that brain surgery might be necessary because of the fluid in K.V.'s brain. In addition, K.V. continued to require a retinal specialist because blood was still clearing from one of her eyes.

At the contested jurisdiction and disposition hearing in January 2020, mother appeared telephonically and provided stipulated testimony through her trial counsel. She reported K.V. missing to law enforcement on March 26, 2019. Sometime during the following month, she went to family law court for the purpose of obtaining custody of K.V. but could not serve father because she did not know his address. In May 2019, she again reported to law enforcement that K.V. remained missing and that she had been "'contacted by someone impersonating a medical professional in order to obtain information about [K.V.].'" In support of her contentions about contacting law enforcement, mother submitted photographs of copies of pamphlets entitled "Report Information and Victims' Bill of Rights" dated March 26, 2019, and May 21, 2019, that she received from the Los Angeles County Sheriff's Department both times that she reported K.V. missing to them. Mother's attorney argued that K.V.'s condition while in mother's care should not have resulted in the detention of K.V.

In an addendum report filed with the court the day of the hearing, the Department reported that mother was pregnant with her fourth child and scheduled to deliver the baby by cesarean on the day of the hearing. Mother told the social worker that she would "be prepared" to have K.V. returned to "her care once she ha[d] delivered and [had] adjusted

6

to the new infant." Mother did not say when she believed she would be sufficiently adjusted.

Mother's attorney requested that mother be provided family maintenance services but also indicated that mother was "currently recovering from surgery" and would "very soon be able to care for the children." The Department's attorney emphasized mother's statement in the addendum report that mother would not be ready to care for K.V. until sometime after the birth of the new baby.

The juvenile court sustained the allegations against mother in the third amended petition. Specifically, the court found that K.V. came within subdivision (b)(1) of section 300, sustaining the allegation that mother was not a member of K.V.'s household, had failed to maintain contact with K.V., and "fail[ed] to . . . provide [K.V.] with adequate food, clothing, shelter, or medical treatment," and protection. The court also sustained the allegation under that subdivision that mother had a "criminal arrest history," including prostitution, and that "such conditions place [K.V.] at risk of suffering serious physical harm." The court also sustained allegations against father as to K.V. under subdivisions (a), (b), and (e) of section 300. K.V. was declared a dependent and removed from the physical custody of mother and father.

As to disposition, the juvenile court adjudged K.V. a dependent of the court and found that there was clear and convincing evidence to remove K.V. from the care of both father and mother under section 361, subdivision (c)(1). Reunification services for father were bypassed under section 361.5, subdivision (b)(5). The court ordered reunification

7

services for mother and authorized the Department "to allow mother to have unsupervised, overnights, weekends, extended visitation, or placement on family maintenance with mother as soon as deemed appropriate."

DISCUSSION

A. *Jurisdictional Findings*

Mother concedes that the juvenile court's exercise of jurisdiction over K.V. was proper, challenging only two of the juvenile court's numerous jurisdictional findings—namely, the findings that K.V. comes within section 300, subdivision (b)(1), because of mother's general neglect and mother's "'criminal arrest history.'" "The general rule is that 'the juvenile court's exercise of jurisdiction over a child will be upheld if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition.'" (*In re M.R.* (2017) 7 Cal.App.5th 886, 896 (*M.R.*).) "The juvenile court's various jurisdictional findings with respect to [father] are not challenged in this appeal, and are independently sufficient to justify the juvenile court's exercise of jurisdiction over [K.V.]." (*Ibid.*) It is nevertheless appropriate "to reach the merits of the other parent's jurisdictional challenge in three situations: (1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.) We therefore address the

8

merits of mother's challenge to the two jurisdictional findings against her, because those findings serve as the basis of the dispositional order that she also challenges.

Mother challenges the sufficiency of the evidence supporting both of the jurisdictional findings against her under section 300, subdivision (b)(1). We agree about the finding based on her arrest history but do not agree about the finding of general neglect.

Section 300, subdivision (b)(1), allows the juvenile court to assume dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment . . . ."

"'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633.) The appellant bears "the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206 (*E.E.*).)

With respect to the finding about mother's criminal arrest history, the juvenile court sustained the allegation that mother's "criminal arrest history including, but not limited to: prostitution . . . place[d] the child at risk of suffering serious physical harm." The undisputed evidence shows that mother has been arrested for solicitation. But there is no evidence in the record to support the conclusion that those arrests placed K.V. at any risk of harm. The Department acknowledges that mother's "history of prostitution does not automatically place a child at risk," but the Department argues that the finding is still supported because "K.V. was found to have a number of serious health concerns that were caused as a result of negligence in mother's supervision." But there is no evidence that mother's solicitation arrests had anything to do with those health concerns. Nor did the Department present any evidence that there was any ongoing risk of serious harm to K.V. caused by mother's previous solicitation arrests. Because the Department presented no evidence that mother's arrest history subjected K.V. to risk of any harm, let alone serious physical harm, the Department failed to carry its burden of proof to establish jurisdiction based on mother's criminal arrest history. (*M.R.*, *supra*, 7 Cal.App.5th at pp. 897-898.) We consequently vacate the juvenile court's true finding on the allegation that mother's criminal arrest history placed K.V. at risk of serious harm under section 300, subdivision (b)(1).

We reach a contrary conclusion concerning the jurisdictional finding under section 300, subdivision (b)(1), that mother was not a member of K.V.'s household, failed to maintain contact with K.V., and failed to provide K.V. with "adequate food, clothing,

10

shelter, or medical treatment," and protection. The record contains substantial evidence that, when K.V. was in mother's care, K.V. suffered serious harm or illness as a result of mother's negligent failure to provide K.V. adequate food, clothing, shelter, or medical treatment. When K.V. was taken from mother's custody, K.V.'s body and feet were filthy even though she was not yet crawling, she had a fungal infection around her mouth caused by poor hygiene, and she had a yeast infection and terrible sores in her diaper area. Father and stepmother took K.V. to the hospital for diagnosis and treatment of the yeast infection. Mother admitted to the social worker that K.V. had thrush and a bad rash while in mother's care. Mother claimed to have sought medical treatment, but the juvenile court was free to disbelieve her. On appeal, mother contends that K.V.'s conditions "do not necessarily constitute neglect," but her argument misses the point. Failure to obtain proper treatment for K.V.'s multiple infections constitutes medical neglect. Apart from mother's self-serving statements, which the juvenile court was free to disbelieve, the record contains no evidence that mother attempted to obtain proper treatment. It is therefore irrelevant that the conditions themselves might not necessarily constitute neglect—failure to obtain treatment does constitute neglect. Moreover, the juvenile court could reasonably infer from the totality of the circumstances—including the filthy condition of K.V.'s body even though she was not crawling or walking, the poor hygiene that caused a fungal infection, the severity of the sores in K.V.'s diaper region, and the yeast infection—that mother's neglect had either caused K.V.'s injurious conditions or caused them to be worse than they would otherwise have been. For all of

11

these reasons, we conclude that there was substantial evidence that K.V. suffered serious harm or illness as a result of mother's negligence.

Mother also argues that there is no evidence that "such neglect would recur with the child in [her] care." But the record contains no evidence that mother's previous neglectful parenting was a one-time lapse in judgment, and mother herself stated that she was not yet ready to have K.V. placed in her care. For both of those reasons, the juvenile court could reasonably infer that if K.V. were returned to mother, mother's parenting would continue to be negligent.

For all of these reasons, we vacate the juvenile court's true finding on the jurisdictional allegation concerning mother's criminal arrest history, but we affirm the true finding on the jurisdictional allegation concerning mother's general neglect of K.V.

B. *Dispositional Order*

Mother argues that the juvenile court prejudicially erred by removing K.V. under section 361, subdivision (c)(1), because K.V. was not residing with her when the proceedings were initiated. She contends that the juvenile court instead should have applied section 361.2, subdivision (a). The Department counters that section 361.2, subdivision (a), is inapplicable because K.V. resided with mother when the events underlying the jurisdictional allegations as to mother took place. The Department concludes that the juvenile court properly applied section 361, subdivision (c)(1), and that the court's findings were supported by substantial evidence. We agree with both parties to some extent: neither section 361, subdivision (c)(1), nor section 361.2, subdivision (a),

12

applies.  The juvenile court's error, however, was harmless, because the necessary findings under the appropriate statutory provision, subdivision (d) of section 361, were supported by substantial evidence.

"We normally review an order removing a child from parental custody for substantial evidence viewing the record in the light most favorable to the juvenile court's findings."  (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 344 (*Anthony Q.*).)  "When the issue on appeal involves the interpretation and proper application of the dependency statutes, however, our review is de novo."  (*Ibid.*)

Section 361, subdivision (c)(1), provides in pertinent part that a child shall not be taken from the physical custody of a parent "with whom the child resides at the time the petition was initiated" unless the court makes certain findings, including that there would be a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor . . . ."  The record contains no evidence that K.V. resided with mother at the time the petition was initiated, so subdivision (c)(1) of section 361 does not apply.  (*Anthony Q.*, *supra*, 5 Cal.App.5th at p. 343.)

Section 361.2, subdivision (a), provides that when the court removes a child under section 361, the court must then "determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of

13

the child." And "[i]f that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) K.V. was residing with mother at the time of the events or conditions that brought K.V. within the provisions of section 300 as to mother—namely, K.V.'s multiple infections and mother's medical neglect—so section 361.2 does not apply.

The juvenile court should have applied subdivision (d) of section 361. Under that provision, a dependent child shall not be taken from the custody of a parent "with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child" if the child were placed in the parent's custody, and there are no reasonable means to protect the child without removal. (§ 361, subd. (d).) The required findings are identical to the required findings under section 361, subdivision (c)(1). Here, the juvenile court found that "[t]here is clear and convincing evidence of the circumstances stated under [section] 361[, subdivision] (c)(1) as to both mother and father." Because the circumstances that the juvenile court must find under the two statutory provisions are identical and the same standard of proof applies (§ 361, subd. (c)), the juvenile court's error was harmless if the

14

findings under section 361, subdivision (c)(1), were supported by substantial evidence.[2] (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303 (*D'Anthony*).)

Mother acknowledged that she was not prepared to take custody of K.V., which itself constitutes substantial evidence that placing K.V. with mother would create a substantial danger to K.V.'s well-being. Mother's assessment of the situation and the juvenile court's determination are further supported by additional evidence. When K.V. resided with mother, mother struggled to properly care for K.V. K.V. was found to be filthy and suffered from a fungal infection around her mouth and a yeast infection in her diaper area that required medical treatment. K.V. was not then "medically fragile." But K.V. subsequently suffered a traumatic brain injury while living with father and continued to require specialized care as a result. Given K.V.'s dramatically increased medical needs, mother's history of struggling to care for K.V. even when she did not have those needs, mother's having to care for a new infant, and mother's request that she not take custody until some time after she adjusted to living with the new baby, we conclude that there was substantial evidence supporting the juvenile court's findings

---

[2]     The Department incorrectly claims that "'"jurisdictional findings are prima facie evidence the minor cannot safely remain in the home."'" As this court recently explained in *E.E.*, *supra*, 49 Cal.App.5th at pages 218-219, jurisdictional findings constitute prima facie evidence that the child cannot safely remain in the home only if the court took jurisdiction under section 300, subdivision (e). (See § 361, subd. (c)(1) ["The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent"].) The presumption therefore would apply to father because of the true finding on the section 300, subdivision (e), allegation against him. It does not, however, apply to mother because the only jurisdictional findings against her were under subdivision (b)(1) of section 300. (*E.E.*, at pp. 218-219.)

under section 361, subdivision (c)(1).  Because those findings are identical to the findings required by subdivision (d) of section 361, the court's error in applying subdivision (c)(1) of section 361 was harmless.  (*D'Anthony*, *supra*, 230 Cal.App.4th at p. 303 ["In view of the juvenile court's 'substantial danger' finding under section 361, subdivision (c)(1), and the evidence supporting that finding with respect to [mother], we conclude the court's error did not result in a miscarriage of justice"].)

DISPOSITION

We vacate the juvenile court's true finding on the jurisdictional allegation concerning mother's criminal arrest history.  We otherwise affirm the jurisdictional and dispositional findings and orders of January 16, 2020.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

MILLER
Acting P. J.
RAPHAEL
J.

16