Filed 10/29/20  In re R.H. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re R.H., a Person Coming Under Juvenile Court Law. | B304597 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP07595A) |
| Plaintiff and Respondent, | |
| v. | |
| M.Z., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Reversed in part and affirmed in part.

Katie Curtis, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

---

**INTRODUCTION**

This appeal raises two issues: whether the juvenile court abused its discretion by ordering appellant M.Z. (Mother) to participate in individual counseling as part of its dispositional order regarding her daughter R.H. (Rachel), and whether Mother has forfeited her right to appeal the order on that ground.[1]  We find Mother has not forfeited her right to appeal.  We further find that because the factual basis underlying the court's order for individual counseling was unsupported by the record, the court abused its discretion in ordering such counseling.  Accordingly, we reverse the portion of the dispositional order requiring Mother to participate in individual counseling.

Rachel, then 11 years old, came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when a fire broke out in the home she

---

[1]    Though not her official name, R.H. is referred to as "Rachel" throughout the record.

shared with her father Z.H. (Father).[2] Responding firefighters discovered more than 500 marijuana plants growing in the house and contacted the police, who arrested Father for illegal marijuana-growing and child endangerment and alerted DCFS. DCFS filed a petition with a single count under Welfare and Institutions Code section 300, subdivision (b)(1) (Section 300(b)(1)), alleging Father's marijuana-growing endangered Rachel. Mother was not a party to the petition.

After the court found a prima facie case that Rachel was a person described under Section 300(b)(1), it released her to both parents, knowing she would be staying with Father, who had been her primary caregiver for most of her life. A few weeks later, however, it was discovered that a restraining order issued in Father's criminal case prohibited him from having contact with Rachel. At DCFS's request, the court removed Rachel from Father and released her to Mother, granting Father visitation to the extent allowed by the restraining order. While the restraining order was later modified to permit Father to visit Rachel, it was still in place by the time the disposition hearing occurred. Consequently, after finding jurisdiction over Rachel, the court released her to Mother, telling Father to inform the court if the restraining order was lifted, so the court could return custody to him. Over Mother's objection, the court also

---

[2] Mother and Father were divorced, and Mother was not living with Father and Rachel. Father is not a party to this appeal.

ordered Mother to participate in individual counseling, finding she needed to gain insight into the dangers of the situation that Father had placed Rachel in. As discussed below, we conclude substantial evidence does not support the conclusion that Mother lacked this insight, and therefore the court abused its discretion in ordering her to participate in individual counseling.

## STATEMENT OF RELEVANT FACTS

### A. *DCFS Files a Petition Under Section 300(b)(1); the Court Releases Rachel to Her Parents*

DCFS detained Rachel in November 2019 after the home she shared with Father caught on fire. Responding firefighters discovered over 500 marijuana plants growing in the house and informed the police, who arrested Father for child endangerment and illegally growing marijuana.

Several days later, a children's social worker (CSW) spoke with Rachel's mother. Mother stated that Father had taken custody of Rachel when she and Father separated years earlier. Though Mother had moved to Fresno, she still visited Rachel three to four times a month, and had last seen her two weeks before. Mother reported she had called Rachel that very day, but Rachel had refused to speak to her. Mother said Rachel had been angry with her for "giving her up" to Father. Mother stated she did not go to Father's house and did not know what he did there.

4

DCFS subsequently filed a petition under Section 300(b)(1), alleging that Father "created a detrimental and endangering home environment in that the father cultivated illegal marijuana plants in the child's home within access of the child. On 11/20/19 the father was arrested for Child Endangerment. The detrimental and endangering home environment established for the child by the father, endangers the child's physical health and safety, and places the child at risk of serious physical harm, damage and danger." The court found a prima facie case that Rachel was a person described under Welfare and Institutions Code section 300, but found reasonable services available to prevent detention, and released her to both parents, with the understanding that Rachel would reside with Father.[3]

### B. *A Previously Issued Restraining Order Is Discovered*

On December 13, 2019, DCFS discovered that a protective order had been issued in Father's criminal case, ordering Father to have no contact with Rachel. After DCFS contacted Father and he agreed to abide by the restraining

---

[3] The court stayed the portion of the order releasing Rachel to Father for a week to permit DCFS time to assess the home at which Father was then staying (the prior home had been damaged by the fire). The court granted Father unmonitored visits while the order was stayed. DCFS released Rachel to Father on December 9.

order, DCFS arranged for Mother to pick Rachel up from school and keep Rachel in her care.

On December 17, 2019, DCFS filed an ex parte request asking the court to remove Rachel from Father and release her to Mother. A detention report filed the same day contained a statement from Rachel: "'I have a normal relationship with my mother. I feel safe to stay with my mother.'" The court granted DCFS's request, but also ordered that Father's contact with Rachel be coterminous with the restraining order. The court also stated that should the restraining order be modified to the extent that Rachel could be returned to Father's custody, a request for such relief could be made on an ex parte basis. Father had a criminal hearing scheduled for December 20, two days later, and indicated he would try to get the restraining order modified.

### C.  *DCFS Interviews the Parties*

Because Mother believed that Rachel would be returning to Father after his December 20, 2019 hearing, Rachel initially stayed with one of Mother's friends.[4] Mother would both drop Rachel off at school and pick her up, and would stay with her at the friend's house until Rachel went to bed. However, after Father's hearing was continued to

---

[4]    Mother was renting a room in Monterey Park but was uncomfortable having Rachel stay with her because too many other unknown residents rented rooms there.

January 13, 2020, and a dependency investigator (DI) expressed concern with Rachel's living arrangements, Mother agreed to -- and shortly thereafter did -- find a place for Rachel to safely stay with her.

Responding to the DI's questions about Father's activities, Mother told the DI she had not known Father was growing marijuana. Now that she knew, she thought he "'deserved to be punished by the law.'" However, Mother explained she had no concerns about returning Rachel to Father's custody, stating "'I do not have issues for [Rachel] to return to [Father's] care. My ex-husband has been providing good care for [Rachel] since she was little. My ex-husband loves [Rachel] very much.'" She also stated that had she known Father was growing marijuana, she would have had Rachel "'returned to my care.'"

Rachel told the DI she was fine with the current living arrangements but would prefer to live with Father. Although she felt safe with both parents and had more fun with Mother, she thought Father took better care of her. She also stated that Father had informed her he was growing marijuana plants and asked her not to go in the rooms where they were growing. The doors to those rooms were always locked, but she could smell something "'disgusting'" when Father opened them. She stated that when she and Father were being taken to the police station the night of the fire, she asked him whether he would be growing marijuana again, and he responded, "''No way. I am so scared to do it again.''" Rachel believed him.

7

The DI also interviewed Father. Her report stated that Father "appeared to be remorseful, worried and tearful when [he] talked about his wish to visit the child. The father was sincere, open and cooperative during the interview." He took responsibility for illegally growing marijuana, expressed remorse, and promised not to do it again. He would instead "'do regular work, such as construction work'" or "'be a driver.'" He explained that he had decided to grow marijuana sometime in August or September of 2019, because he needed a way to earn money, but also have flexible hours to take care of Rachel. The plants were not yet grown when the fire occurred, so he had not sold any. He stated he had told Rachel to never go in the rooms where the marijuana was growing, and that he did not think she knew it was marijuana.

On January 13, 2020, Father's criminal restraining order was modified to permit "peaceful contact" with Rachel.

## D. *The Court Finds Rachel to Be a Dependent, Releases Her to Mother, and Orders Mother to Participate in Individual Counseling*

On February 5, 2020, the court held a combined adjudication and disposition hearing. DCFS moved several exhibits into evidence without objection; no witnesses testified. Proceeding to argument, Rachel's counsel asked the court to sustain the petition as pled. Mother's counsel simply noted Mother was non-offending. Father's counsel expressed that Father was very remorseful, and there was

8

no current risk to Rachel given his promise not to grow marijuana again. DCFS's counsel argued that Rachel was at severe future risk given Father's knowing disregard for her safety. The court sustained the petition as pled, and moved on to disposition.

For disposition, Rachel's counsel advised the court that Rachel wanted to return to Father and that, but for the criminal restraining order, counsel herself would be requesting that Rachel be released to both parents. Because of the restraining order, however, counsel asked the court to release Rachel to Mother, with unmonitored visits for Father. Mother's counsel did not argue about Rachel's placement, but expressly objected to the recommendation for individual counseling in Mother's case plan, arguing there was no basis for the order because she was non-offending and did not reside in the home where the marijuana-growing took place; counsel confirmed Mother had no objection to family preservation services or family counseling when appropriate. In response to Mother's objection to individual counseling, DCFS's counsel argued individual counseling was necessary because "Mother seems to have no insight as to the dangerous situation that her child was placed in. She continues to minimize Father's actions, and her plan is basically to return the child to the father. And so based on that, the department's position would be that she needs to gain some insight." Rachel's counsel disagreed, opining that Mother was "very aware of the dangerousness of the situation." Father's counsel expressed agreement on placing

9

Rachel with Mother, and DCFS's counsel agreed with granting Father unmonitored visits.

The court removed Rachel from Father, noting a criminal protective order precluded placing her with him, and released her to Mother; Father was granted unmonitored visits. The court further stated that if the criminal court lifted the protective order, Father should let his attorney know immediately "so they can let the court know so I can make other orders about releasing the daughter to your care." The court reiterated that it was "really important that if there is any change with the criminal protective order, you let your attorney and the social worker know right away." As to individual counseling for Mother, the court ordered that it occur through family preservation services, which would occur "in the home," and not as a "separate, outside program." The court explained it was ordering individual counseling "for the reasons noted by" DCFS's counsel. The court then reminded Father to let his social worker or attorney know if the criminal protective order was changed "so that way we can do something about it or perhaps have other orders in place here in dependency." Mother appealed the disposition order the next day.

## DISCUSSION

### A.  *Mother Has Not Forfeited Her Appeal*

"'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.]  Forfeiture . . . applies in

10

juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings.' [Citation.] A party may not assert theories on appeal which were not raised in the trial court." (*In re C.M.* (2017) 15 Cal.App.5th 376, 385.)

Here, DCFS's recommended case plan included individual counseling for Mother. Mother's counsel specifically objected to this because Mother was non-offending and did not reside in the home where the marijuana-growing took place; therefore there was no basis to order her to counseling. Mother's counsel confirmed she was not objecting to family preservation services or family counseling when appropriate. After counsel had argued, the court ordered Mother to participate in individual counseling through family preservation services.

DCFS now argues that because Mother did not object to family preservation services or the court's order that individual counseling take place through family preservation services, she forfeited the right to appeal the order for individual counseling. We disagree. It is undisputed that Mother expressly objected to individual counseling, and that when she confirmed her lack of objection to family preservation services, the court had yet to order or even suggest that individual counseling take place through family preservation services. After the court made its order, it did not ask Mother whether this modified arrangement mooted her objection, and Mother gave no indication that it did. DCFS cites no authority that would require Mother to renew

her objection, after the court announced an order containing a provision to which she had already objected, in order to preserve her right to challenge that portion of the order on appeal.[5]

## B.    *The Court Abused Its Discretion*

### 1.    **Standard of Review**

"If a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . ." (Welf. & Inst. Code, § 362, subd. (a).)  "The juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . . .  That order may include a direction to participate in a counseling or education program . . . ." (Welf. & Inst. Code, § 362, subd. (d).)  Though the code provides that "[t]he program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300"

---

[5]     The two cases DCFS cites are inapposite.  (*In re C.M.*, *supra*, 15 Cal.App.5th at 385 [appellant acknowledged failure to raise issue in trial court]; *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345 ["[F]ailure to object to a disposition order on a specific ground generally forfeits a parent's right to pursue that issue on appeal"].)

(*ibid.*), case law has held that "[t]he court's broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion, permits the court to formulate disposition orders to address parental deficiencies when necessary to protect and promote the child's welfare, even when that parental conduct did not give rise to the dependency proceedings" (*In re K.T.* (2020) 49 Cal.App.5th 20, 25). We review the juvenile court's disposition orders for an abuse of discretion, and review for substantial evidence the findings of fact on which dispositional orders are based. (*Ibid.*)

### 2. Substantial Evidence Does Not Support the Court's Conclusion That Mother Needed to Gain Insight into the Dangers of Growing Marijuana

When, over the objection of Mother's counsel, the court ordered Mother to participate in individual counseling, it explained it was doing so "for the reasons noted by" DCFS's counsel. Those reasons were: "Mother seems to have no insight as to the dangerous situation that her child was placed in. She continues to minimize Father's actions, and her plan is basically to return the child to the father." Substantial evidence does not support the conclusion that Mother lacked insight or minimized Father's actions.

It is undisputed that Mother was not living with Father and Rachel when the marijuana-growing began, and that she did not know about it until after the fire. Had she

13

known, she stated she would have had Rachel "'returned to my care.'" Mother also opined that Father should be "punished by the law" for his actions.

The only evidence DCFS presents to demonstrate Mother's purported lack of insight into the dangerousness of the situation and minimization of Father's actions, is a statement Mother purportedly made after Rachel was placed with her, in which Mother "expressed little to no concern regarding the child's safety, stating she wanted the child to immediately return to father's care." We are unpersuaded.

First, DCFS's paraphrase of Mother's statement is inaccurate. Mother's actual statement was: "'I do not have issues for [Rachel] to return to [Father's] care. My ex-husband has been providing good care for [Rachel] since she was little. My ex-husband loves [Rachel] very much.'" In other words, Mother neither expressed nor implied indifference to Rachel's safety; she was saying she did not believe her safety would be in jeopardy in Father's custody.

Second, while DCFS faults Mother for wanting to return Rachel to Father, DCFS fails to address the fact that this was the court's preference as well. After finding a prima facie case for jurisdiction, the court ordered Rachel released to both parents, and stayed the order as to Father only to permit DCFS to assess Father's new house for suitability. DCFS did, and then released Rachel to Father. Later, at disposition, the court placed Rachel with Mother, noting that the criminal protective order precluded placement of Rachel with Father. But the court emphasized that if the criminal

14

protective order was modified or lifted, Father should let his attorney know immediately "so they can let the court know so I can make other orders about releasing the daughter to your care." At the end of the hearing, the court again reminded Father to let his social worker or attorney know if the criminal protective order was changed "so that way we can do something about it or perhaps have other orders in place here in dependency." Mother's desire to do what the court itself wanted to do cannot be evidence of her lack of insight or tendency to minimize the seriousness of Father's actions.

DCFS presents no other evidence to support the conclusion that Mother lacked insight or minimized Father's actions, and we have found none in our examination of the record. While the requirement that Mother participate in individual counseling was doubtless made with Rachel's best interests in mind, it cannot be justified where the factual predicate underlying that portion of the order was unsupported by the record. (See *In re K.T.*, *supra*, 49 Cal.App.5th at 25-26 [juvenile court abused discretion by ordering father to complete parenting education program where substantial evidence did not support finding that program was necessary to protect child].) Because we find substantial evidence does not support the finding that Mother lacked insight or minimized the seriousness of

15

Father's conduct, we conclude the court exceeded its discretion in ordering individual counseling on that basis.[6]

---

[6] On appeal, DCFS argues that individual counseling was also warranted because Mother had not been Rachel's primary caregiver, Rachel had been angry at Mother for "giving her up," and Rachel believed Father took better care of her than Mother. Neither DCFS nor the court raised these issues below; the court specifically stated it was ordering Mother to individual counseling for the reasons stated by DCFS's counsel (i.e. lack of insight and minimization of Father's actions). In any case, to the extent these issues would benefit from professional attention, DCFS fails to explain why they could not be adequately addressed through family counseling, which the court ordered and to which Mother did not object.

## DISPOSITION

The portion of the juvenile court's dispositional order requiring Mother to participate in individual counseling is reversed.  In all other respects, the dispositional order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

COLLINS, J.

17