Filed 12/7/20  In re J.S. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | C090771 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.S.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD239844) |

Appellant, Ja.S. (Father), appeals from a dispositional order of the juvenile court in a Welfare and Institutions Code section 300[1] proceeding.  The court found that there would be a substantial danger to the child J.S.'s, physical health, safety, protection, and physical or emotional well-being if the presumed Father, with whom the child did not

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

reside at the time the petition was initiated, were to live with the child, and there were no reasonable means by which the child's physical or emotional health could be protected without removing the child from Father's physical custody. Father contends: (1) the court applied the wrong legal standard in making this determination; and (2) the court's finding that he posed a substantial danger to J.S. was not supported by substantial evidence. We will affirm

## FACTUAL AND PROCEDURAL BACKGROUND

J.S. was born in 2019. Father was not married to the child's mother, L.S. (Mother), and she is not a party to this appeal. The Sacramento County Department of Child, Family and Adult Services (Department) became involved with J.S. soon after his birth because both of the parents had been involved in recent dependency proceedings for J.S.'s half-siblings. On May 10, 2019, the Department received a referral from a mandated reporter alleging that Mother had cognitive and mental health issues that placed the newborn, J.S., at risk of harm. The referral noted that Mother had two other children out of her care in the dependency system. On the same day, a subsequent referral was made by a different mandated reporter. This referral alleged that J.S. was born premature at 34 weeks gestation and he would remain in the neonatal intensive care unit due to being premature. The allegation stated that Mother was diagnosed with depression, post-traumatic stress syndrome (PTSD), and cognitive delays. The reporter also stated that Mother suffered from intermittent depression and anxiety symptoms throughout the pregnancy and had suicidal ideation as recently as a month prior to J.S.'s birth.

J.S. was the subject of an original dependency petition under section 300, subdivisions (b)(1) and (j), filed on May 15, 2019. On July 1, 2019, a first amended petition was filed containing similar allegations. Pursuant to subdivision (b), the Department alleged J.S. was at a substantial risk of harm because Mother had cognitive deficits and a mental illness, which impaired her judgment and ability to provide care for J.S. On July 30, 2018, a psychologist, Dr. Jayson Wilkenfield, diagnosed Mother with "a

2

severe unspecified bipolar disorder with anxious distress, a rule-out impression for schizoaffective disorder (bipolar type), post-traumatic stress disorder, and personality disorder in which paranoid and avoidant dysfunctional personality attributes appear most prominent." Dr. Wilkenfield also opined that Mother had cognitive deficits and "would likely score in the borderline to low average range of intellectual ability." The Department further alleged that Mother struggled to adequately parent J.S. during visits.

Pursuant to section 300, subdivision (j), count No. j-1 referred to the incidents that led to the dependency cases for the maternal half-siblings, and alleged that J.S. was at a similar risk of harm. Count No. j-2 referenced the history of domestic violence between Father and the mother of the paternal half-siblings, which caused the paternal half-siblings to come within the jurisdiction of the juvenile court, and alleged that J.S. would be at a similar risk of harm. During the most recent incident of domestic violence, the children were present in close proximity and Father "accidentally hit the child . . . in the stomach."

The detention report alleged that J.S. would not be safe in the care of either parent due to Mother's cognitive and mental health issues, the open dependency case for the maternal half-siblings, and Father's unsuccessful reunification with the paternal half-siblings. On May 15, 2019, the Department obtained a protective custody warrant and placed J.S. into protective custody on that date.

A detention hearing was held on May 17, 2019. Over the objection of both parents, the court found the Department had established a prima facie case J.S. came within the jurisdiction of section 300, subdivisions (b) and (j), and that there were no reasonable means to protect him other than continuing his removal from parental custody.

A combined jurisdiction/disposition report was prepared by social worker NaKisha Bailey. Mother reported a traumatic childhood that included sexual and physical abuse and acknowledged her PTSD that caused her to have depression. She reported she had experienced some depression during her pregnancy with J.S. due to not

3

having his half-siblings in her care.  But she had learned coping skills and did not think her PTSD affected her ability to parent her children.  She denied having any suicidal ideations in April 2019.  Mother participated in mental health services, had completed parenting education and domestic violence counseling, and was engaged with Alta Regional services.  She questioned why J.S. had been removed from her care, explaining that she thought he would remain in her care while she received reunification services for the maternal half-siblings.  Mother visited J.S. three times a week and wanted him returned to her custody.

Bailey further reported Father had known Mother for more than two years but had not observed her to be mentally unstable during this period of time.  She had told him that she received services from Alta Regional to help her with some life management skills.  Father told Bailey that the allegations in the petition about the history of domestic violence between him and the paternal half-siblings' mother were true.  However, he reported having changed since November 2017, and he believed he had benefitted from attending the domestic violence classes.  Although he did not have a probation officer, he checked in with the probation department every other month.  He was still unemployed but continued to seek employment.

Bailey further reported that on May 22, 2019, the permanency social worker noted Mother was doing well in her case plan for the maternal half-siblings.  She had been receiving independent living skills through a service provider and had completed domestic violence counseling and was engaged in individual counseling.  Mother's counselor, Susan Little, reported Mother had engaged in the counseling sessions and was addressing the trauma she had from her past.  In November 2018, after discussions with her mental health care providers, it was agreed she did not need to take psychotropic medication so long as she participated in frequent medication evaluations.  The permanency social worker did not have a "current record of [Mother] engaging in ongoing evaluations" but believed she would benefit from such evaluations.  Mother's

4

independent living skills provider informed the Department that the mother was no longer benefitting from these services and terminated the services, expressing concerns about her mental health.

A first addendum report contained information about a visit to the parents' residences by Bailey. She visited Mother's home on June 6, 2019. Bailey noted Mother had plenty of food in the home as well as age appropriate necessities for J.S. Bailey observed that Mother had installed child safety devices on the cabinets, drawers, and front door, and she encouraged Mother to keep cleaning supplies locked up. Mother was visiting with J.S. three times per week, and she was attentive to the child during visits. Bailey also met with Father at the paternal grandparents' home. Father stated he had moved into their home in May 2019 after his separation from the paternal half-siblings' mother. Father stated he did not have provisions for J.S. but could obtain them if he were placed in his custody. The paternal aunt, who was present during the meeting as support for Father, stated she was willing to assist him with obtaining clothing, diapers, and other necessities. Father was willing to engage in services and reported completing 40 out of the 52 weeks of domestic violence classes.

The Department wanted J.S. to remain placed outside of Mother's home so that she could receive additional counseling services. The Department did not want J.S. placed with Father because he had a criminal conviction for domestic violence, was found to have abused children in his case, and had not finished the services from the case plan in the paternal half-siblings' case. According to the Department, he had not made sufficient progress in addressing his role in the domestic violence that led to the removal of his other children.

A second addendum report included a proposed case plan for the parents. Father was to participate in counseling, a domestic violence program, a parenting education class, and a CPR/First-Aid class for children ages zero to five years old.

A third addendum report, dated July 29, 2019, noted Mother had completed her scheduled counseling sessions with Little. Little reported Mother had made progress and would continue to benefit from additional sessions. Mother had not yet received an evaluation for psychiatric medication but was in the process of scheduling one with her medical providers. Father stated he had been unable to resume the domestic violence classes because they cost $30 per session and he could not afford it. He told Bailey the Department had previously paid the provider for the remainder of these courses during the case plan for the half-siblings, but the service provider currently refused to honor the payment. A social worker confirmed the payment was approved but stated since Father "never followed through," she was unsure if the provider would honor the previous payment. Both parents continued to have supervised visits with the child, arrived on time, and engaged with J.S. throughout the visits.

A fourth addendum report was filed on September 24, 2019. The report noted Mother had contacted her primary care physician who told her he did not see a need for her to take medication. The Department received confirmation from the provider that Father had enrolled in the domestic violence classes.

A contested jurisdiction/disposition hearing began on September 26, 2020. Father objected to the court taking jurisdiction and requested that J.S. be placed with him if he were removed from parental custody. Shannon Bispham, a visitation supervisor, testified that she had been observing visits between the parents and J.S. for "four to six months." She had been aware of the concerns about the mother's mental health issues and cognitive abilities. As a visitation supervisor, Bispham had observed clients who displayed obvious symptoms of mental health issues such as auditory hallucinations, incoherence, or aggressiveness. During the visits Bispham had supervised, the mother had not displayed any cognitive deficits or symptoms of mental health issues. Mother had been calm, coherent, and appeared to be a good parent to J.S. during the visits.

6

Bispham had not noted any safety concerns about Father's interactions with J.S. during the visits.

Little was a therapist with WellSpace Health. She had a master's degree in marriage and family therapy and had been a therapist with WellSpace Health for seven years, specializing in treating clients who were receiving reunification services from the Department. She disagreed with how the addendum report characterized her evaluation of Mother's progression in their sessions. Little believed that Mother had benefitted from the sessions and made significant progress in therapy. She also thought that Mother's mental health issues would not be detrimental to her parenting ability. Little disagreed with the accuracy of the diagnoses made by Dr. Wilkenfield. She did not believe that Mother's state of mental health would in any way be detrimental to her children.

Social worker Megan Daniel testified about Mother's progress in the case plan for the two maternal half-siblings. At the 12-month proceeding for the maternal half-siblings that had been held on April 22, 2019, Daniel had recommended that the juvenile court find Mother had made significant progress in her case plan. Since then, she noticed some decompensation with Mother after Father became more involved in her daily life. Daniel stated that she had always had concerns about Mother's relationship with Father, particularly his involvement in her daily life, even though they were not necessarily in a relationship. Mother shared with Daniel that, in her domestic violence classes, she was "coming to understand that a lot of the interactions she was having with [Father] were indicative of domestic violence and the cycle of domestic violence."

Mother testified that she acknowledged that she has issues with depression and PTSD. She had taken Seroquel, Zoloft, Abilify, and Mirtazapine at different times in her life for depression. Mother reported that she was not living with Father and did not think that she depended on him for daily activities. She was co-parenting with Father and not in a romantic relationship with him. She and he disagreed at times, but she denied there had ever been any type of domestic violence between them.

7

At the conclusion of testimony and after hearing counsel's arguments, the juvenile court took the matter under submission and noted the 18-month review hearing was coming up for the maternal half-siblings. The court indicated it planned to issue a ruling addressing all of the matters at one time. Subsequently, the court issued a written ruling in which it sustained the allegations of the first amended petition, with the exception of a clause indicating Mother was unable to adequately parent J.S. during visits. The court declared J.S. a dependent of the court, and found clear and convincing evidence of a substantial danger to his physical health, safety, or emotional well-being if he were returned to Mother's custody, and there were no reasonable means to protect him other than to continue his removal from her custody. The court also found by clear and convincing evidence a substantial danger to J.S.'s physical health, safety, or emotional well-being if he were placed with Father, the noncustodial parent, since there was an active dependency case for the half-siblings, and Father had not completed his court-ordered 52-week domestic violence class, general counseling, and parenting classes.

Father filed a timely notice of appeal.

## DISCUSSION

We review the dispositional findings for substantial evidence. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161, 1163-1164.) The California Supreme Court has recently explained that "when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

8

# I

## *Statutory Findings*

Father appeals the juvenile court's dispositional order, contending the court abused its discretion at the dispositional hearing because it applied the wrong legal standard in determining that placing J.S. with Father would be a "substantial danger" to the child. Specifically, he contends the court erred when it ordered placement with him posed a substantial danger to J.S. under section 361, subdivision (d), rather than making a detriment finding necessary to deny a noncustodial parent's request for placement under section 361.2, subdivision (a).

Section 361, subdivision (d), added to the code and effective beginning in 2018 (Stats. 2017, ch. 665, § 1), provides: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody." If the court orders that a child be removed from parental custody at the dispositional hearing, it must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . ." (§ 361, subd. (e).) Section 361.2, subdivision (a) provides: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that

9

placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. . . ."

Here, the record indicates the court proceeded under section 361, subdivision (d) when deciding whether to remove J.S. from Father in that the court used "the substantial danger" language both in its written ruling and when it adopted the findings/orders attached to the Department's report. Specifically, the court wrote, "Finally, by clear and convincing evidence I also find that there would be a *substantial danger* to [J.S.'s,] well-being if he were to live with his father, the non-custodial parent. [Father] has an active dependency case with a half-sibling to [J.S.], and [Father] has not completed his court-ordered 52 week Domestic Violence Offender Program, general counseling, or parenting classes." (Italics added.) Further, the court adopted the language in the findings/orders contained in the Department's report, confirming that it was considering and applying the section 361, subdivision (d) standard, "[t]here is clear and convincing evidence that there would be a substantial danger to the child's, [J.S.], physical health, safety, protection or physical or emotional well-being if the presumed father, [Father], with whom the child did not reside at the time the Petition was initiated, were to live with the child or otherwise exercise the parent's right to physical custody, and there are no reasonable means by which the child's physical or emotional health can be protected without removing the child from the parent's physical custody."

The juvenile court also considered and applied section 361.2 when it decided whether to place J.S. with Father. While the Legislature added section 361, subdivision (d) as the legal standard to use when deciding whether to remove a dependent child from a noncustodial parent, it left section 361.2 untouched. Section 361, subdivision (d) and section 361.2, subdivision (a) share similarities, but subdivision (d) of section 361 alone requires the analysis of substantial danger to be undertaken while considering whether that danger exists if the child lived with the noncustodial parent or that noncustodial parent otherwise exercised his or her right to physical custody. Section 361.2,

subdivision (a), conversely, requires a finding of whether the placement would be detrimental to the child if a request is made for placement by the noncustodial parent. Here, the juvenile court considered both statutes. It adopted the section 361.2, subdivision (a) detriment findings attached to the Department's report, finding that placement with Father "would be detrimental to the safety, protection, or physical or emotional well-being of the child." However, the court did not explicitly reference the "detriment" standard or subdivision 361.2, subdivision (a) in its written ruling.

We conclude that the court's failure to specifically reference section 361.2, subdivision (a) in its written ruling, even if error, would not compel reversal. In *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303-304, the Court of Appeal concluded that the dependency court's application of section 361 instead of section 361.2 to a noncustodial parent was harmless error: "[T]he [dependency] court found 'by clear and convincing evidence' that the requested placement with father posed 'a substantial danger to the children's health.' In view of this evidence, and the court's express finding under section 361, we cannot say it is 'reasonably probable' that the court would have made a different finding had it considered whether the placement would be detrimental to the children's safety or physical well-being under section 361.2." (*D'Anthony D.*, at p. 304; see *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 339 [dependency court's erroneous application of § 361, subd. (c) to noncustodial parent was harmless error].) We likewise conclude that that it is not reasonably probable the court would have made a different finding had it explicitly considered the "detriment" standard under section 361.2, subdivision (a) in its written ruling because the court found by clear and convincing evidence that J.S.'s, placement with Father posed a "substantial danger" to the child. If such a placement with Father posed a "substantial danger" to J.S. then it was also thereby detrimental to the safety, protection, or physical or emotional well-being of the child. Thus, any error was harmless.

11

## II

### *Substantial Evidence*

Defendant further contends that even if the juvenile court made an adequate finding of detriment under section 361.2, subdivision (a), there was insufficient evidence to support the finding that placement with Father would be detrimental to J.S. We disagree.

The evidence adduced at the dispositional hearing through report, testimony, and judicial notice was that Father had a history of domestic violence, had an active dependency case involving domestic violence, and had failed to complete his court-ordered domestic violence program, general counseling, or parenting classes. Father has had three referrals to the Department involving Father as the perpetrator of domestic violence. During the most recent incident, the father and mother of J.S.'s half-siblings engaged in domestic violence in the presence of the half-siblings and during the altercation, Father hit the three-year-old half-sibling in the stomach accidentally. Father described this domestic violent incident as "the worst in his relationship history." He described how he and the half-siblings' mother "did a number" on each other and the mother had to be transported to the hospital. This incident resulted in Father's incarceration and the initiation of a juvenile court case. Indeed, while much of the testimony at the dispositional hearing focused on Mother, social worker Daniel's primary ongoing concern for Mother, after previously reporting Mother's progress, was due to Father's involvement in her life and the potential for their relationship to develop into a cycle of domestic violence. Viewed cumulatively and in the light most favorable to the decision below, there was substantial evidence in support of the juvenile court's finding that placement of J.S. with Father would be detrimental to J.S.'s well-being.

Further, the court specifically sustained the section 300, subdivision (j), count No. j-2 petition finding that J.S. was at risk of harm due to Father's prior dependency case and Father's failure to treat the problem of domestic violence. Father does not

12

challenge this jurisdictional finding. Where a parent has not appealed from the jurisdictional findings, the same evidence that supports dependency jurisdiction is prima facie evidence supporting the juvenile court's dispositional order removing the child from the parent's custody. (*In re A.F.* (2016) 3 Cal.App.5th 283, 292.)

We therefore conclude that ample evidence supports the juvenile court's finding by clear and convincing evidence that placement with Father before he has made progress in addressing the anger and domestic violence issues posed a substantial danger to J.S. and would be detrimental to the safety, protection, or physical or emotional well-being of J.S.

## DISPOSITION

The juvenile court's dispositional order is affirmed.


　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　RAYE, P. J.



We concur:



　　/s/
BLEASE, J.



　　/s/
KRAUSE, J.