Filed 7/22/21  In re M.C. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | B308704 |
| | (Los Angeles County Super. Ct. Nos. 20CCJP03695, 20CCJP03695A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.C.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Pete R. Navarro, Commissioner.  Affirmed.

Elizabeth A. Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

The juvenile court exercised jurisdiction over eleven-year-old M. under Welfare and Institutions Code section 300[1] following multiple incidents of physical abuse by father M.C. (father).  The court also exercised jurisdiction over M. based on father's domestic violence toward his female companion and father's alleged alcohol abuse.  As part of its disposition order, the juvenile court ordered father to participate in drug testing and individual counseling to address domestic violence and substance abuse issues.

Father does not challenge the finding of jurisdiction based on physical abuse, but he appeals the court's jurisdictional order regarding domestic violence and alcohol abuse.  We find that substantial evidence supports the juvenile court's order on these grounds. Father also appeals the portions of the disposition order requiring him to participate in drug testing and individual counseling to address domestic violence and substance abuse.  We find no abuse of discretion, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Detention

Eleven-year-old M. came to the attention of the Los Angeles Department of Children and Family services (DCFS) through a referral to the child abuse hotline on June 1, 2020.  According to the detention report, the caller reported that M. was a victim of

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

physical abuse by father. M.'s mother (mother) and father shared custody, and M. had recently traveled to Las Vegas to visit paternal grandmother. Mother traveled to Las Vegas to retrieve M., and paternal grandmother told mother that M. "had some injuries." M. had "a belt mark to the side of his face" and a mark on his leg. M. "initially . . . attempted to lie to protect his father," but later admitted that father "whooped" him with a belt. Paternal grandmother also observed M. picking at his hair, which paternal grandmother believed to be a result of stress. Mother had been staying with a paternal relative, but after returning from Las Vegas she no longer felt safe there and moved into a shelter.

A children's social worker (CSW) interviewed M. on June 10, 2020. By then M. had been staying with mother for two weeks. When asked whether he felt safe with father, M. said, "No." M. told the CSW that father "drinks Hennessy every day" and would become "mean and aggressive" when he drank. M. also reported that father would drive to get more alcohol, even after he had already been drinking. M. said father's girlfriend, I.V., smoked marijuana, and I.V.'s 14-year-old daughter, J., would care for M.'s three younger half-siblings—seven-year-old Me., five-year-old Mal., and three-month-old Ma.—while father and I.V. were under the influence.

M. told the CSW that father hit him as a form of discipline. Once father punched M. in the stomach because he was running late for school and could not find his shoes. Another time, father choked M., but M. could not remember why. M. later told a medical provider that as father was choking M. with his hands and M. could not breathe, father said, "Good night," and M. thought he was going to pass out. M. stated that when he was

3

seven years old, he ordered a movie without realizing that father's credit card would be charged. When father found out, he hit M.'s legs with a hanger, leaving a mark.

When asked about the marks mother observed after M.'s trip to Las Vegas, M. said he and Me. had gotten into a fight on May 21 or 22, and "the father became upset and began to 'wail' on him with a belt. The child stated that father hit him roughly 8-9 times on his back, bottom, and face." The CSW observed a "large patch of hair missing from [M.'s] head," which M. could not explain. M. was examined by a medical provider on June 18. Although the incident with father had occurred nearly a month earlier, the medical provider found fading bruises on M.'s buttock, thigh, and face that were consistent with M.'s statements. M. said I.V.'s daughter J. and their half-siblings are also afraid of father, "especially when he drinks heavily, as he becomes more aggressive." M. stated that father had also hit 14-year-old J. on the legs with a refrigerator handle, leaving bruises.

The CSW asked M. about domestic violence in the home involving I.V. M. stated that he had not observed any domestic violence, but he knew it happened because he had seen I.V. with "a busted lip and a black eye." M. said father was arrested for that incident. M. said I.V. and father "are always arguing," and one time he saw father throw a hairbrush at I.V., which hit her on the head. M. later told the medical provider that he witnessed father punch I.V. in the face while the family was sitting at the dining room table, and "the kids saw [I.V.'s] face start swelling."

The CSW interviewed mother the same day. Mother told the CSW that she and father shared custody of M., and they were supposed to each have M. 3.5 days per week pursuant to a court order. However, mother said she had not seen M. for two months

4

before picking him up in Las Vegas, "because the father withheld him from her and she did not have the father's new address." Mother stated that M.'s birthday had recently passed, and she and father agreed that father would have M. for the first half of the day, and mother would have him for the second half. Mother said father did not allow her to see M. on his birthday, however, and because mother did not know father's address, there was nothing she could do about it. Mother received a call from paternal grandmother the following day to come get M. from Las Vegas, and paternal grandmother said she "was concerned that something may be happening at the father's house." When mother pressed for details about what might be happening with father, paternal grandmother would not be specific, but she suggested that M. was not safe with father. Mother told the CSW that "the paternal side of the family knows something is going on, but always tries to cover up for the father out of fear, as the mother stated the father has a 'bad' temper." Mother told the CSW about finding marks on M.'s bottom and face. Mother also observed that M. had a "big patch" of hair missing.

Mother told the CSW that she and father were together from 2007 to 2009, but they were never married. Mother said father was very abusive toward her, and she sustained injuries from the domestic violence. Mother told the CSW that she "grew up in foster care and does not have a support system and therefore when she left the father, she got into prostitution due to not having any skills or an education, but left that life in 2015." Mother said she had no history of drug or alcohol use. She said the existing custody order had been initiated by father, and she had been under the impression that there was nothing she could

do to change it. The CSW told mother she could seek changes to the order through the court.

The CSW spoke with father by phone on June 18, 2020. The CSW told father she would need to meet with him in person to assess his living situation for M. Father said he was no longer living with I.V., but he would not provide a current address. Father told the CSW that mother was unstable, and that mother "took" M. from him while M. was visiting paternal grandmother in Las Vegas.

DCFS found two prior referrals for the family. In April 2016, allegations of neglect, physical abuse, and emotional abuse were made after law enforcement responded to a domestic violence incident involving father and I.V. According to the detention report, while father and I.V. were in an argument, "[f]ather pushed [I.V.] down to the floor, got on top of her, choked her, and bit her in the head. This occurred in the bathroom and the children were right outside the bathroom door. [I.V.] attempted to leave with the children. Father attempted to take [I.V.'s] cell phone away and they began pushing and pulling [I.V.'s] phone. Father broke [I.V.'s] home [*sic*]. [I.V.] was able to leave the home and flagged law enforcement down." Father was arrested. The DCFS referral was deemed "inconclusive," and closed after I.V. said she would no longer maintain a relationship with father.

The second referral stated that on October 31, 2018, father and I.V. got into an argument in which father "punched [I.V.] on the mouth and nose, causing her to bleed from the face." Father also pushed I.V. to the floor, where he "stood over her and punched her with his right hand." Mal. and Me. witnessed the incident; M. was not home at the time. The referral was deemed

6

inconclusive, and the investigation was closed after I.V. obtained a restraining order that was active through November 2021. Father was convicted of felony inflicting corporal punishment on a cohabitant, and sentenced to 270 days in jail and five years' probation.

When father spoke to the CSW again on June 23 and 25, father asked about the allegations in this case. The CSW told father about the marks mother observed on M. Father denied that M. had any marks when he left to visit paternal grandmother in Las Vegas. Father said he believed mother was coaching M. into making up allegations. Father declined to meet the CSW in person, saying he was concerned that he would be arrested.

Father explained that he and mother had been together for a little more than a year; the relationship ended shortly after M. was born in May 2009. Father "did not deny the [domestic violence], but stated that it was mutual combat, yet he was the one that would be arrested." Father denied any domestic violence with I.V., but when the CSW told him there was a record of domestic violence from 2018, father "admitted to it." Father said he and I.V. had not been together in over a year. When the CSW noted that M. said he had been living with father and I.V., father denied it and said that he and M. had been staying with a friend. Father refused to give the friend's information to the CSW. Father said the address M. had provided to the CSW was false; father had given M. a false address "because in the past, the mother would show up uninvited and cause 'problems.'" The CSW asked about three-month-old Ma., whom M. said was father's and I.V.'s child. Father said Ma. was his child, but with a different woman. Father denied using any physical discipline on

M. Father also denied daily alcohol use, saying that he only drank socially on occasion. Father agreed to drug test for DCFS; the result was negative for all substances.

On June 26, 2020, father called the CSW and told her that a couple of months ago, M. reported that mother punched him. The CSW asked if police or DCFS had been called, and father said no. The CSW asked mother and M. about the incident, and both denied that mother had punched M. M. also confirmed that he had been living with father, I.V., and their children before DCFS became involved. The CSW asked M. about whether Ma. was I.V.'s child, and M. confirmed that I.V. was pregnant before Ma. arrived.

The CSW interviewed paternal grandmother on June 29, 2020. Regarding the allegations in the referral, paternal grandmother said M. has never been abused. Regarding the mark on M.'s face, paternal grandmother said M. told her that he got into a fight with his sister, and father "spanked him with the belt and the belt slipped, hitting his face." Paternal grandmother also said M. has a habit of pulling his hair out when he is nervous, but paternal grandmother attributed M.'s stress to "what is mother is taking him through, which is keeping him traumatized." Paternal grandmother said mother's visitation with M. was inconsistent, and once while in mother's care M. sustained a cigarette burn to his face, which mother said was an accident. Paternal grandmother said mother had no stable home for M. She was unaware of any domestic violence between father and I.V., said they were no longer together, and said that Ma. was father and I.V.'s child. Paternal grandmother denied any substance abuse by father.

The CSW spoke with I.V. on June 29, 2020. I.V. said she and father had not been together for two years, and that Ma. was her child with another man. I.V. also told the CSW that father has never mistreated any of the children. She said father drinks on occasion, but does not have a drinking problem. I.V. refused to provide a current address to the CSW.

The CSW spoke with a foster mother with whom mother had resided as a teenager. Foster mother said she and mother remain in contact. Foster mother was aware of the domestic abuse between mother and father during their relationship. Foster mother said mother did not use drugs or alcohol. She had no concerns about M. in mother's care.

DCFS found that M. was at high risk of future abuse or neglect by father. While M. was still in mother's care, on July 7, 2020 the court granted DCFS's request for an order removing M. from father.[2] On July 10, 2020, DCFS filed a petition under section 300, which included two counts under subdivision (a), and four counts under subdivision (b)(1). Counts a-1 and b-1 alleged that father "physically abused [M.] by repeatedly striking the child's face, back, and buttocks with a belt inflicting bruising to the child's face and buttocks. On a prior occasion, the father choked the child, causing the child to have difficulty breathing. On prior occasions, the father struck the child with belts. On a prior occasion, the father struck the child's stomach with the father's fist. On a prior occasion, the father struck the child's leg with a hanger inflicting a mark. Such physical abuse was excessive and caused the child unreasonable pain and suffering.

---

[2]DCFS noted that a referral had been made to the Orange County Department of Children and Family Services for father's other children.

9

The child is afraid of the father." Counts a-1 and b-1 alleged that father's physical abuse endangered M.'s physical health and safety, and placed M. at risk of serious physical harm. Counts a-2 and b-2 alleged that father and I.V. have a history of domestic violence in the presence of M., including father striking I.V. on the face with a fist and father throwing a hairbrush at I.V., striking her face. Counts a-2 and b-2 also noted father's convictions for injury to a spouse/cohabitant, and stated that father's "violent conduct" places M. at risk of serious physical harm.

Count b-3 alleged that father "has a history of substance abuse and is a current abuser of alcohol, which renders the father incapable of providing regular care and supervision of the child. On prior occasions, the father was under the influence of alcohol while the child was in the father's care and supervision. The father's substance abuse endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger." Count b-4 alleged that father "created a detrimental and endangering home environment for the child in that the father allowed [I.V.] to possess, use, and be under the influence of marijuana in the child's home and in the presence of the child." Count b-4 further alleged that drug use in the home placed M. at risk of serious physical harm.

At the detention hearing on July 15, 2020, father's counsel stated that father believed that mother was "coaching the child into making these statements." Father's counsel pointed out discrepancies between mother's statements and paternal grandmother's statements, and suggested that mother was trying to get custody of M. Mother's counsel submitted on the allegations, and M.'s counsel asserted that there was "plenty of

evidence" to meet the prima facie burden. The court stated that it was inclined to adopt DCFS's position, and DCFS "submitted on the court's tentative." The court found a prima facie case that M. was a person described by section 300, and ordered M. detained from father and placed with mother. The court ordered monitored visitation for father and set an adjudication hearing for August 14, 2020.

## B.    Amended petition

On August 11, 2020, DCFS filed a first amended petition. The amended petition added an allegation to counts a-1 and b-1 stating, "On a prior occasion, [father] chased the child around the family home with a knife." The amended petition also added two new counts, a-3 and b-5, which both stated that father and mother "have a history of domestic violence. In February of 2009, the father was arrested for Inflict Corporal Injr Spouse/Cphab [*sic*]. Such violent conduct on the part of [father] against [mother] endangers the child's physical and emotional health and safety and places the child[ ] at risk of physical and emotional harm, damage and danger."

A jurisdiction/disposition report filed before the August 14, 2020 hearing stated that M. continued to reside with mother, and he felt safe in her home. Mother and M. were living in a transitional housing apartment, and the CSW noted no safety concerns. In an interview with a CSW on July 21, 2020, M. said that on the date father choked him, father then told M. to take a shower. M. said, "'After I showered, he started drinking and he told my sister [Mal.] (age 8) to go get a knife and a rag, and he started chasing me around the house.' The child stated that he heard his father tell [Mal.] to get a rag due to blood." M. told the CSW that he could not sleep that night. He also said, "When he

11

got the knife, I thought it was going to be my last day. I thought he would kill me. He even said, 'I'm sorry son, but I gotta do this, take you out.'" M. also repeated some of his earlier allegations of abuse, and stated, "When I misbehave my dad whoops me. He whoops me with a belt all around, and it hurts me and I cry."

Regarding the domestic violence between father and I.V., M. said they argue and call each other bad names. He said father "used to hit her . . . a lot. He would hit her on the face with his fists, and she would bleed and cry, she had a busted nose and lip." M. said the last time they fought was two years ago on Halloween, and said, "I think the classes that my dad takes worked, because now that he takes classes he doesn't hit [I.V.], he only argues with her."

Regarding father's alcohol use, M. said, "My dad drinks Hennessy, he has little bottles. But he gets big bottles when we go somewhere, like my aunties [*sic*] home. After he drinks Hennessy he waits to get it out of his system. He can handle it. But when he gets mad, it does affect him. I know it affects him when he gets mad." Regarding I.V.'s marijuana use, M. said that I.V. "smokes outside," and it was "probably weed." He said the other children "know about the smoking too." M. said father does not smoke marijuana. Regarding the domestic violence allegation between father and mother, M. said he recalled seeing "my dad push and punch my mom; I was like 4 or 5 years old." M. did not recall any further details or incidents.

In an interview by phone, father again denied the allegations that he physically abused M., stating that mother was coaching M. Father said he did "give my son a whooping back in 2016" with a "belt across the butt" after M. gave one of the other children a black eye. Father denied that M. was present during

12

the domestic violence incident with I.V. in October 2018. Father said he went to jail for five months after that incident. Father said that he and I.V. had not been together for about two years. Father also told the CSW, "[M]y son has not experienced any domestic violence, he doesn't know about things like that."

Father denied the allegations about alcohol abuse, stating, "I don't abuse drugs or alcohol. I may have a drink on weekends, I don't get drunk and I don't black out." Father also said that M. knows nothing about alcohol, and "if he knows about the word 'Hennessy' that's because his mom told him, she is coaching him. I am willing to do another drug and alcohol test to prove it." Father stated that I.V. was not a marijuana user, but that mother does use drugs. Father suggested that DCFS needs to investigate mother's drug use to ensure that M. is safe.

Father admitted domestic violence against mother, stating that they had a "toxic relationship." Father said he only had one physical argument with mother, when "I hit her at the welfare office and a cop was passing by and witnessed it and I got arrested." Father said mother was pregnant with M. at the time. Father said that mother "has a bad temper, she is toxic, she busted my windows, she used to grab knives, she lies about it being me."

Mother stated that she worries about M.'s "emotional needs" and "long term emotional stability" due to the stress of the abuse by father. Mother said that M. was "slowly disclosing the abuse that he went through," and she did not know about it before May. Regarding the domestic abuse between her and father, mother said that father had "choked me in the past and to the point where I have passed out. He pushed my face to bar windows and to a BBQ pit." Mother also recalled the incident in

13

which father hit her and a police officer witnessed it. She said father was "an alcoholic" who "can get violent when he drinks." Mother said she had a medical marijuana card and she used marijuana to help her sleep. She said she had been a heavy marijuana user in the past.

A paternal aunt told the CSW that father's family had known mother for over a decade, and mother had been staying with paternal aunt before the DCFS investigation began. Paternal aunt recently tried to file an ex parte request in the court because she would like to have custody of M. Paternal aunt said she was not aware of any physical abuse by father. As for father's alcohol use, paternal aunt said, "Yes, on weekends my brother will have a drink," but she had never seen him intoxicated. Paternal aunt did not think I.V. used drugs. She was aware of the domestic violence charges against father involving both I.V. and mother.

DCFS requested that the court find all of the allegations in the amended petition true. DCFS stated that in light of father's criminal history for domestic violence, it had "concerns with father's insight and his impulsivity, as evident by [father's] aggressive and dangerous behavior." DCFS asked that the court order various services for both mother and father. The services DCFS recommended for father included a parenting education program, a domestic violence program for perpetrators, individual counseling, and random drug and alcohol testing with any missed or dirty test resulting in the requirement to complete a drug or alcohol program. DCFS also recommended monitored visitation for father.

At the adjudication hearing on August 14, 2020, father requested a continuance for additional time to respond to the

14

recently filed first amended petition. The court continued the adjudication hearing to September 14, 2020.

A last-minute information filed September 14, 2020 stated that father was nearly finished with a 52-week domestic violence program for perpetrators, which was apparently required following the domestic violence incident with I.V. Father and M. had two monitored visits, which went well.

## C. Jurisdiction and disposition

At the jurisdiction hearing on September 14, 2020, father testified that M. had not been present during the domestic violence incident with I.V. in October 2018. When asked how often he drinks alcohol, father answered, "Occasionally. Very occasionally. Probably on a Sunday out of the weekend." Father also testified that he drinks "a cup at most." Father said he used physical discipline on M. in 2016, after M. "punched his sister in the eye" and father disciplined him to "let him know that that's not right." Father denied chasing M. with a knife, choking M., or hitting M. with a hanger, and stated that he believed M. made these statements because he was "being coached by his mother." On cross-examination by M.'s counsel, father also denied punching M. in the stomach or disciplining M. before his trip to Las Vegas. When asked how M. could have gotten the marks found after his trip to Las Vegas, father said he did not know, but thought it could be from M. playing roughly with his friends. On cross-examination by DCFS's counsel, father said M. had never seen him under the influence, and M. "don't even know what alcohol is." Father also submitted a letter from his employer stating that father had been employed since March 2019, and that father was a "model employee" who "excels in his role."

The parties began making closing arguments, but as M.'s counsel was arguing, the court remarked that the facts were "not so clear." M.'s counsel offered to have M. testify if the court wanted clarification. The court agreed, and the hearing was continued.

An interim review report dated October 7, 2020 stated that M. continued to live with mother, and he was having some behavior problems. During a monitored visit with father, father called mother "a 'b**ch', and 'M****F**** Liar' while in front of the child." (Alterations in original.) Father also told M. "to lie in the upcoming Court hearing / testimony." A younger half-sibling also encouraged M. to "lie for dad." The following day, M. said he did not want to visit father because he was mad at him for talking about mother. When the social worker spoke with father, he said mother coaches M., and father asked for a paternal aunt to monitor the visits. Father also said M. asks father when M. can come home to father's house.

DCFS recommended that the amended petition be sustained as alleged. DCFS recommended that father's visits be monitored by DCFS personnel in a DCFS-approved setting. DCFS recommended reunification services for father, as well as parenting education, domestic violence education, individual counseling, and random drug and alcohol testing with any positive test resulting in an assessment for a drug and alcohol program.

At the continued hearing on October 7, 2020, M. testified that he was at his aunt's house during the domestic violence incident between father and I.V. in October 2018. When he came home, he saw that I.V. "had a busted lip," her face was bleeding, and father had been arrested. When his counsel asked what

16

happened next, M. testified, "The police came in the hospital. Police started asking me questions." M. said he stayed with his aunt that night. M. testified that before that incident, M. saw father throw a brush at I.V.'s head, causing a knot on I.V.'s forehead. M. also testified that when he was about seven years old, he heard arguing from another room, and when I.V. came out of the room she had a black eye.

Regarding the May 2020 incident, M. testified that two days before his birthday he got into a fight with his sister Mal. while 14-year-old J. was watching the children. When father got home, M. was "on top of" his bed, and father told him get down because "he has a piece of cake for me." M. did not comply, "[b]ecause I knew that I had hit my sister and that I was going to get a whooping." Once M. got down, father "went to go get his belt" and "he hit me with the belt" on "[m]y face, my butt, and my leg." M. testified that he was "screaming," and when J. asked father to stop, he did. M. said he had purple marks from the belt that stayed for about a week. The same day, father "told my sister go grab a knife and a rag." The sister, eight-year-old Mal., looked scared but did as she was told. The knife was silver and black with a sharp edge, and father held the knife at chest height pointing toward M. Father "was chasing me around with the knife" until teenage J. told father to "chill." M. said he did not sleep well that night; he woke up to find father by his bed, and "I was kind of scared when I woke up when I seen him right there," but father only said, "Sorry." When paternal grandmother took M. to Las Vegas, M. told her about the incident.

M. also testified that when he was in fifth grade, "we were running late for school," M. could not find his clothes, and father "hit me in my stomach." When asked to show how father

17

punched him, M. demonstrated and said, "Like this, but like – it's like an uppercut, but it's like a body punch" with a closed fist. M. said another time he ordered a movie, and he was not aware that it was not free. When father found out about the charge the next morning, "my dad went to go grab his hangers. And then he started hitting me with his hangers." Paternal grandmother had been sleeping; she woke up when she heard M. screaming and told father to stop. M. said he had marks on his body after that.

The court asked M., "Did you ever see your dad drink?" M. said yes, father drinks Hennessy, and "sometimes he puts it on the table," and "when I'm eating, I can see it." When asked how often father drinks, M. said, "Often." M. said father had been drinking before the knife incident, but he had not been drinking before the belt incident.

On cross-examination, father's counsel asked about the knife incident saying, "What do you mean by chasing?" M replied, "Like running around the house." M. said that at his birthday party two days later, he still had a mark on his face from the belt. When paternal grandmother asked him what happened, M. said "nothing."

In cross-examination, M. testified that father told him about three weeks ago to "lie." M. also testified that father referred to mother as "bitch." M. testified that after father drinks "sometimes he gets mad, but most of the time he argues – [I.V.] argues with him." M. said that other times father had hit him after he had been drinking, but he could not remember when. The court asked, "Are you afraid of your dad when he's drinking?" M. said, "Yeah." Then he stated, "I'm afraid of him when I'm by myself, but when I'm with somebody, with him, I'm not." The court asked, "Does his personality change in any way when he's

drinking?"  M. said yes, it changes in "[l]ike a mad way."  The court asked M. if father had choked him, and M. said, "Yeah," the same day as the belt and knife incident.

Father's counsel called father to testify in rebuttal.  Father said he did not tell M. to lie to the court.  Rather, M. said he wanted to come home to father's house, and father advised M. to tell that to the social workers.  Father said he never chased M. with a knife and never told Mal. to go get a knife.  Father testified that M. was not disciplined that day at all, and said, "I believe that he was being coached by his mother."  Father said M. did not have any marks on his face at his birthday party or when he left for Las Vegas with paternal grandmother.

In closing arguments, father's counsel asked that the petition be dismissed.  Father's counsel argued that M. was not present during the domestic violence between father and I.V. in October 2018, and asked the court to dismiss the allegations regarding domestic violence with I.V.  Father's counsel also said that the last domestic violence incident was two years ago, and because father had completed a domestic violence course he had "ameliorated the issue."  Father's counsel said there was no evidence of any risk relating to I.V.'s marijuana use.  Father's counsel also asked that the counts regarding domestic violence with mother be dismissed, because it was "over a decade ago."

Father's counsel further argued that the allegation regarding alcohol abuse should be dismissed, because "[t]here's literally no evidence presented other than [M.'s] statement that father has an alcohol problem.  Father submitted to an on-demand negative drug test from June 30.  He has held down the same job with the same employer for years.  The evidence as presented to the court does not indicate that this father has an

19

alcohol problem." Father's counsel asserted that the "allegations about choking, hitting with the hanger . . . were completely vague," and there were no photographs of the marks allegedly left on M. from any incident. Father's counsel asserted that father and his family members were credible, and M. was not credible.

Mother's counsel asserted that M.'s statements were detailed and credible. She asserted that M. should remain with mother. Noting that M. said he was afraid of father when they were alone, mother's counsel also asked that M.'s visitation with father remain monitored.

M.'s counsel urged the court to sustain the petition, noting that father's abuse only stopped when J. or paternal grandmother stepped in. M.'s counsel also stated that M. witnessed violence against I.V. and saw her injured following the October 2018 incident. M.'s counsel noted that M. knew what Hennessy was and that father drank it, and that it "contributes to all the violence that's happening in this house." M.'s counsel also requested that father's visitation be monitored.

Counsel for DCFS asked the court to sustain the petition. Counsel for DCFS noted that M. stated that he saw the injuries on I.V., and that father gets aggressive when he drinks.

The court sustained three of the counts in the amended petition and dismissed the rest, as follows. As to count a-1 regarding father's physical abuse of M., the court adjusted the language regarding the knife incident to state that father "brandished a knife towards the child in a threatening manner," and sustained the count as amended. The court sustained count b-2 regarding domestic violence with I.V. As to count b-3 regarding alcohol abuse, the court deleted the language stating that father's alcohol abuse "renders the father incapable" of

providing care to M., replaced it with language stating that father's alcohol abuse "limits the father's ability to" provide care for the child, and sustained the count as amended. The court struck counts a-2, a-3, b-1, b-4, and b-5. The court deemed M. to be a dependent of the court under section 300.

Turning to disposition, the court ordered that M. remain in mother's care with a family maintenance plan in place. For father, the court ordered drug and alcohol testing, parenting classes, conjoint counseling with M., and individual counseling to address case issues including domestic violence and alcohol abuse. The court did not order father to complete a domestic violence program or a substance abuse program. The court further ordered that father's visits be monitored. Father's counsel objected to the alcohol testing requirement; the court implicitly overruled the objection.

Father timely appealed. While the appeal was pending, DCFS requested judicial notice that on April 5, 2021, the juvenile court terminated jurisdiction over M., with sole physical custody to mother, joint legal custody to mother and father, and visitation with father to be monitored "until father and minor are able to resolve the minor's anxieties in a therapeutic setting." The juvenile court entered a custody order to that effect on April 8, 2021. Father requested judicial notice that he filed a notice of appeal for the court's April 5 and April 8 orders. We granted both requests for judicial notice.

## DISCUSSION

Father does not challenge jurisdiction based on count a-1 relating to the physical abuse of M. However, father contends that the juvenile court erred in sustaining count b-3 relating to father's alcohol abuse and b-2 relating to domestic violence with

21

I.V., because substantial evidence does not support the court's jurisdictional findings for those counts. He also argues that the court abused its discretion in disposition by ordering father to drug test and participate in counseling to address substance abuse and domestic violence. We find no error.

## A. Mootness

DCFS urges us to dismiss the appeal as moot, because father did not challenge the jurisdictional findings relating to father's physical abuse of M. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)[3]

Father acknowledges that the appeal could be deemed moot, but asks that we exercise our discretion to consider his contentions. "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction.'" (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763 (*Drake M.*).) Father asserts that the court's jurisdictional findings regarding

---

[3]We denied DCFS's motion to dismiss the appeal as moot.

22

alcohol abuse and domestic violence formed the basis of the disposition order he is challenging. He also argues that his "custodial and visitation rights were severely limited" in the orders terminating jurisdiction, and the juvenile court's findings could have ramifications for future custody orders.

We exercise our discretion to consider father's contentions on appeal. The sustained jurisdictional findings against father impacted the court's disposition order, which father has also appealed. In addition, the court's findings could affect his future custody rights to M. or his other children, and could affect future dependency proceedings.

## B.    Jurisdiction

"'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

1.    *Substantial evidence supports jurisdiction relating to alcohol abuse.*

Father asserts that the juvenile court's finding under count b-3 that father's alcohol abuse limited his ability to care for M. was not supported by substantial evidence. DCFS contends that substantial evidence supported the court's finding on count b-3.

Jurisdiction under section 300, subdivision (b)(1) is appropriate when the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm

23

or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1).) To establish jurisdiction under section 300, subdivision (b) due to a parent's substance abuse, the Department must prove: (1) "substance abuse by a parent . . . , (2) causation, and (3) serious physical harm to the child, or a substantial risk of such harm." (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 724-725 (*Rebecca C.*).)

Father asserts that the evidence supporting the court's finding under count b-3 consisted of "the minor's testimony that appellant drank Hennessey and mother's statement that appellant drank Hennessy and he was an alcoholic. . . . [T]hat is it – that is all the evidence of [father's] purported alcohol abuse." Father argues that paternal grandmother and I.V. said that father does not abuse alcohol, and he points out that he maintained steady employment and had no alcohol-related arrests. He asserts that the "flimsy, uncorroborated speculation [that father] was a recent alcohol abuser, and mere speculation that [father's] alcohol use posed a risk to [M.] at the time of the contested hearing in October 2020."

Father's argument minimizes the evidence before the juvenile court. In fact, M. named father's favorite alcohol by brand, and M. testified in court that father drinks "often." M. told the CSW that father drinks "every day" and he became "mean and aggressive" when he drank. M. also told the CSW that father buys small bottles of Hennessy regularly and large bottles when he socializes with family. M. also said of the alcohol, "[W]hen he gets mad, it does affect him. I know it affects him when he gets mad." M. testified that father's personality changes in "[l]ike a mad way" when he drinks. M. testified that

24

he was afraid of father when he has been drinking if other people were not nearby. M. said that on the day of the belt and knife incidents, father had not been drinking before he beat him with the belt, but he had been drinking before he brandished the knife, indicating that father's violent treatment of M. escalated after father consumed alcohol. Father stopped chasing M. with the knife only after teenage J. stepped in and told him to stop. M. also testified that father had hit him other times after father had been drinking, but he could not remember specific instances.

This evidence does not constitute "mere speculation that [father's] alcohol use posed a risk" to M., as father contends. A finding of a substantial physical danger to a child under section 300, subdivision (b) may "involve[ ] an *identified, specific hazard* in the child's environment — typically an adult with a proven record of abusiveness." (*Drake M., supra*, 211 Cal.App.4th at pp. 766-767.) That danger existed here: father does not challenge the findings of physical abuse, and substantial evidence shows that the danger to M. increased when father was drinking.

We are not persuaded by father's assertion that other witnesses—paternal grandmother, I.V., and father himself—were more credible than M. "Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court. Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E., supra*, 171 Cal.App.4th at p. 451.)

Moreover, this is not a case like *Rebecca C., supra*, 228 Cal.App.4th 720 or *Drake M., supra*, 211 Cal.App.4th 754, which father cites. In *Rebecca C.*, the appellate court found that although mother had a substance abuse problem, "the evidence . .

25

. is not sufficient to support the finding that her substance abuse is causing, or there is a risk it will cause, physical harm" to the teenage child. (*Rebecca C., supra*, 228 Cal.App.4th at p. 728.) In *Drake M.*, although father used marijuana, "DCFS failed to show that there was any link between father's usage of medical marijuana and any risk of serious physical harm or illness to Drake." (*Drake M., supra*, 211 Cal.App.4th at p. 769.) Here, by contrast, the evidence showed that father drank alcohol "daily" or "often," father became more mean or aggressive after consuming alcohol, alcohol affected father when he was angry, and M. was afraid to be alone with father when he was drinking. In addition, after consuming alcohol, father chased M. around the home with a knife and stopped only when a teenage sibling stepped in. Unlike *Rebecca C.* and *Drake M.*, here substantial evidence showed that father's alcohol consumption posed a risk of harm to M.

2. *Substantial evidence supports jurisdiction relating to domestic violence.*

Father also contends that substantial evidence does not support the juvenile court's finding in count b-2 that M. was at risk as a result of the domestic violence between father and I.V. He does not dispute that some domestic violence occurred, but argues there was no evidence that domestic violence would occur in the future because father had nearly completed the 52-week domestic violence program required by his probation, there was a restraining order protecting I.V., and both father and I.V. stated that they were no longer together. DCFS asserts that the court's finding is supported by substantial evidence.

"Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b)." (*In re*

*R.C.* (2012) 210 Cal.App.4th 930, 941.)  Domestic violence "may support the exercise of jurisdiction only if there is evidence that the violence harmed the children or placed them at risk of harm, and 'the violence is ongoing or likely to continue.'"  (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1453.)  However, a parent's ""'[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'"  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.)

Father's contentions are not persuasive.  The 2018 incident involving I.V. was not a "one-time lapse in judgment," as father asserts.  To the contrary, father has a long history of domestic violence, including violence against mother many years before this case began, multiple incidents of violence against I.V., and violence against J. and M.  M. reported seeing father throw a brush that hit I.V. in the face, punch I.V.'s face at the dining room table, and hit J. with a refrigerator handle, and M. witnessed I.V.'s injuries and hospital visit in October 2018 after father hit her and made her face bleed.  Moreover, father and I.V. falsely represented in the past that they would separate after incidents of violence.  A 2016 incident involving violence against I.V. while the children were right outside the bathroom door resulted in a DCFS referral, which was dismissed when I.V. said she would no longer maintain a relationship with father.  Following the October 2018 incident a restraining order was entered protecting I.V. from father, but M. reported father and I.V. had been living together.  In addition, Ma. was conceived and born after the October 2018 incident while the restraining order was in place; father and I.V. then gave conflicting stories to the CSW about Ma.'s parentage.

27

"[T]he juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection." (*In re A.F.* (2016) 3 Cal.App.5th 283, 289.) "'[P]ast violent behavior in a relationship is 'the best predictor of future violence.''" (*In re R.C.. supra*, 210 Cal.App.4th at p.942.) Father's long history of domestic violence, father and I.V.'s violation of the restraining order, and father's failure to be forthcoming with the CSW support the court's finding that domestic violence between father and I.V. remained a risk to M.

This case is not like *In re Daisy H*. (2011) 192 Cal.App.4th 713, which father cites. In that case, there was a single domestic violence incident between the parents that occurred either two or seven years before the juvenile court case began. The Court of Appeal held that the incident, without more, could not support jurisdiction: "The evidence was insufficient to support a finding that past or present domestic violence between the parents placed the children at a current substantial risk of physical harm. The physical violence between the parents happened at least two, and probably seven, years before the DCFS filed the petition. There was no evidence that any of the children were physically exposed to the past violence between their parents and no evidence of any ongoing violence between the parents who are now separated." (*Id*. at p. 717.)

Here, M. witnessed multiple incidents of violence between father and I.V., and father's representation that he and I.V. were no longer together was contradicted by the evidence. Substantial evidence supports the court's finding of jurisdiction under section 300, subdivision (b)(1) relating to domestic violence.

## C.    Disposition

Father contends the juvenile court erred by including in the disposition order a requirement that father participate in alcohol testing and individual counseling to address substance abuse and domestic violence issues.  He states again that the jurisdictional findings were not supported, and notes that a restraining order was in place and father was nearly finished with a domestic violence program at the time of the hearing.  Father asserts that requiring him to participate in additional services was burdensome and unnecessary.

DCFS points out that in the juvenile court, father objected only to the court's order requiring alcohol testing.  DCFS asserts that because father did not object to individual counseling below, he has forfeited any challenge to that portion of the disposition order.  Father asserts in his reply brief that he "objected to a portion of his case plan components."

Father did not preserve a challenge to the individual counseling portion of the order.  "[T]he forfeiture doctrine applies in dependency cases and the failure to object to a disposition order *on a specific ground* generally forfeits a parent's right to pursue that issue on appeal." (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345 [emphasis added].)  Thus, father's contention regarding individual counseling has been forfeited.

Even if father had properly preserved this argument, however, we would find no error regarding either the testing or counseling requirements.  A  disposition order "may include a direction to participate in a counseling or education program . . . . The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by

29

Section 300." (§ 362, subd. (d).) "'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071.)

We find no abuse of discretion here. As discussed above, the court's jurisdictional findings relating to alcohol abuse and domestic violence were supported by substantial evidence. The court had discretion to order father to substance abuse testing and individual counseling to address these issues. The juvenile court's orders were specific and individually tailored; the court noted that father was already in a domestic violence program, for example, and did not order that father complete another one.

Father asserts that because he was nearly finished with his required domestic violence course and he and I.V. were no longer together, requiring additional counseling to address domestic violence was duplicative and burdensome. We disagree. The evidence suggests that father and I.V. were living together when the case began. And even after father was enrolled in his domestic violence course, while he was on probation after his conviction for domestic violence against I.V., father hit M. with a belt, choked him, and brandished a knife at him, allowing the inference that father was not internalizing lessons about perpetrating violence against family members. Individual counseling was warranted under the circumstances.

The cases father relies on are inapposite. Father compares this case to *In re Jasmin C.* (2003) 106 Cal.App.4th 177, in which the Court of Appeal held that the juvenile court may not require a nonoffending parent to attend a parenting class where there

30

was no substantial evidence of a potential benefit from the counseling. In that case, the father got into an altercation in which he hit two of his daughters and threatened other family members. The mother "intervened, cooled tempers, restrained her husband, and directed that the police be called." (*Id*. at p. 179.) Although the mother was nonoffending, the juvenile court ordered that she complete parenting education classes. The mother challenged the order and the Court of Appeal reversed, noting that "nothing in the record supported the order, which apparently was based on a rote assumption that mother could not be an effective single parent without parenting classes." (*Id*. at pp. 181-182.)

Father also cites *Drake M., supra*, 211 Cal.App.4th 754. As discussed above, the Court of Appeal in *Drake M.* found that the evidence did not support the jurisdictional finding that the father was a substance abuser. (*Id*. at p. 769.) Addressing the disposition order that required father to participate in drug tests and drug counseling, the Court of Appeal stated, "[T]here is nothing in the record to indicate that [the father] has a substance abuse problem. . . . Without such evidence, the trial court's ordering father to take random drug screens and to participate in drug counseling could not reasonably be designed to eliminate . . . the remaining conditions from which dependency jurisdiction was obtained," which related to only the child's mother. (*Id*. at p. 770.)

Here, by contrast, father was the offending parent, and substantial evidence supported the juvenile court's jurisdictional findings regarding alcohol abuse and domestic violence. The court's orders were targeted at addressing these bases for jurisdiction. We are also unpersuaded by father's argument that

31

the disposition order was overly burdensome because it placed requirements on him that he would not otherwise have. "Juvenile courts should be mindful of the burdens their disposition orders impose on parents already grappling with difficult conditions and circumstances.  However, the paramount concern always must be the child's best interests, and we cannot reverse a disposition order reasonably fashioned to eliminate the conditions that led to dependency jurisdiction, no matter how burdensome its requirements may seem from the parent's perspective." (*In re D.P.*, *supra*, 44 Cal.App.5th at pp. 1071-1072.)

Here, the disposition order was reasonably fashioned to eliminate the conditions that led to dependency jurisdiction, and we find no abuse of discretion.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

MANELLA, P. J.

CURREY, J

32